# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

IN RE:
PHILLIP GOODWYN,
DEBTOR,

SIMPLE PLEASURES, INC.,
PLAINTIFF,

V.

V. RESTAURANTS, INC., AND
VINCE SAELE,
DEFENDANTS.

CIVIL CASE NUMBER
2:06-CV-893-WKW

## MOTION FOR DISTRICT COURT'S RECONSIDERATION OF SUMMARY JUDGMENT

**COMES NOW** V Restaurants, Inc. and Vince Saele, Defendants in the above styled action, by and through their attorney of record, and moves this Honorable Court to reconsider the summary judgment motion pursuant to *Fed.R.Civ.P. 56,* said motion being filed prior to withdrawal of bankruptcy reference. This motion is based on the following grounds:

1. The Defendants filed a motion for summary judgment on March 14, 2006 while the instant case was before the United States Bankruptcy Court for the Middle District of Alabama.

2. The Bankruptcy Court conducted a very brief hearing on the Defendant's motion at which time the Plaintiffs withdrew their jury demand and agreed to the

dismissal of then co-defendant Spectrum/Vaughan Plaza, L.L.C. The Bankruptcy Court then denied in its entirety the Defendant's summary judgment motion that addressed all nine counts of the Plaintiff's complaint. In the Defendant's response to said motion, no "depositions, answers to interrogatories, *nor* admissions on file, together with the affidavits" as required by *Rule 56(c), Fed.R.Civ.Proc.* were advanced or cited to support genuine issues as to factual matters nor was reasons stated for the failure to provide such affidavits as required by *Rule 56(f), Fed.R.Civ.Proc.*.

3.   Following the aforesaid hearing this Honorable Court withdrew the bankruptcy reference and set the instant case for jury trial before this Honorable Court.

4.   The Defendant's summary judgment motion is due to be reconsidered in light of the anticipated trial before a jury. Judicial economy dictates that counts in a complaint that are not grounded in facts, non-existent claims of wrongdoing or legally impossible be stricken from the complaint.

5.   The District Court is free to reconsider a previous ruling on summary judgment. This reconsideration can occur even in the absence of the presentation of new material. *Enlow v. Tishomingo County, Miss., C.A.5 (Miss.) 1992, 962 F.2d 501, rehearing denied 971 F.2d 750*. A prior ruling denying summary judgment motion does not bar reconsideration as case was in a posture for trial. *Weit v. Continental Illinois Nat. Bank and Trust Co. of Chicago, N.D.Ill.1979, 478 F.Supp. 285, affirmed 641 F.2d 457, certiorari denied 102 S.Ct. 1610, 455 U.S. 988, 71 L.Ed.2d 847, rehearing denied 102 S.Ct. 2001, 456 U.S. 938, 72 L.Ed.2d 461*.

6.   The Defendants attach the original summary judgment motion along with attachments and depositions and the reply to response to motion for summary judgment.

Said records were also made a part of the record in this case as follows: Docket Entry Number 1, #16 Motion for Summary Judgment and #18 Reply to Response to Motion for Summary Judgment.

**RESPECTFULLY SUBMITTED** this the 4th day of December, 2006.

**/s/ Daniel G. Hamm**

DANIEL G. HAMM (HAM043)
ATTORNEY FOR DEFENDANTS,
V RESTAURANTS, INC AND VINCE
SAELE
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

# CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this Motion for District Court's Reconsideration of Summary Judgment by electronic transmission or by placing a copy in the United States Mail with sufficient postage for first class delivery to the attorneys named below or parties if not represented by counsel.

**DONE** this the 4th day of December, 2006.


/s/ Daniel G. Hamm
_____
DANIEL G. HAMM (HAM043)
ATTORNEY FOR DEFENDANTS,
V RESTAURANTS, INC AND VINCE
SAELE
560 S. MCDONOUGH ST., STE. A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

Von Memory
James Day
469 S. McDonough Street
Montgomery, Alabama 36104

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**PHILLIP GOODWYN,**<br>**DEBTOR,**<br><br>**SIMPLE PLEASURES, INC.,**<br>**PLAINTIFF,**<br><br>**V.**<br><br>**V. RESTAURANTS, INC.,**<br>**DEFENDANT.** | **CHAPTER 7**<br>**CASE NO. 05-32325-WRS**<br><br>**ADVERSARY PROCEEDING**<br>**NO. 05-03062** |

## MOTION FOR SUMMARY JUDGMENT

**COMES NOW** V Restaurants, Inc. and Vince Saele, Defendants in the above styled action, by and through their attorney of record, and moves this Honorable Court pursuant to *Fed.R.Civ.P. 56* and *Fed.Bank.R. 7056* for entry of summary judgment in favor of the Defendants on the following issues:

**Breach of Contract:** The Plaintiff, Simple Pleasures, Inc., and Phillip Goodwyn were in breach of the contract by failing to comply with one of the material terms of contract between the Plaintiff and Defendants.

**Conversion**: There is no evidence of 1) a wrongful taking, 2) an illegal assumption of ownership, 3) an illegal use or misuse of another's property, or 4) a wrongful detention or interference with another's property.

**Unjust Enrichment:** The underlying contract made a part of the Plaintiff's complaint reflects the agreement between the parties and precludes recovery for unjust enrichment.

**Damages for Use:** The Defendants finds no actionable claim under Alabama law which fits the allegations contained in this count. In addition there is no proof that Gator's Restaurant generated any profits during the period between the time V Restaurants took possession of the restaurant and the time that Simple Pleasures' interest in the restaurant was terminated.

**Fraud:** The Plaintiff has produced 1) no evidence of a false representation of a material fact nor is there 2) a specified time, place or date as required by *Rule 9, Federal Rules of Civil Procedure* upon which any misrepresentation was made by the Defendants.

**Negligence:** The Plaintiff has produced 1) no evidence of any duty the Defendants owed the Plaintiff nor 2) that the Defendants were negligent in any manner.

**Wantonness:** The Plaintiff has produced 1) no evidence of a reckless indifference for the consequences, nor 2) some wrongful act or omission of some known duty which produced injury to the Plaintiff.

**Willfulness:** The Plaintiff has produced no evidence of 1) a willful or intentional injury nor 2) a knowledge of the danger accompanied with a design or purpose to inflict injury.

**Conspiracy:** The Plaintiff has produced no evidence 1) of any agreement between the Defendants that caused any harm to the Plaintiff and 2) conspiracy itself furnishes no cause of action in Alabama.

## ADMISSIONS AND UNDISPUTED FACTS

1. Simple Pleasures was a restaurant and food service corporation in Montgomery, Alabama. Goodwyn is the president of Simple Pleasures. (Plaintiff's Complaint)

2. Simple Pleasures owns and previously operated a restaurant on the east side of Montgomery, Alabama commonly known as "Gators". Gators is located at 5040 Vaughn Road, Montgomery, AL, 36116-1149. Gators has been previously known as Gators Plaza Café, however, recently it was renamed Gators Fish House. (Plaintiff's Complaint)

3. Simple Pleasures had a host of financial problems including unpaid Federal tax obligations which resulted in Federal tax liens, unpaid obligations to Regions Bank and an arrearage owed to the restaurant's landlord. (Goodwyn deposition pg. 25 – 28)

4. In the past two years, Goodwyn and Simple Pleasures have actively pursued and investigated several offers to sell the assets, goodwill, and customer base of Gators. (Plaintiff's Complaint)

5. In or about July 2004, Goodwyn received an offer from V Restaurants and Saele to purchase Gators, and ultimately the parties agreed to a $90,000.00 purchase price. (Plaintiff's Complaint)

6. For the purchase price, V Restaurants and Saele agreed to purchase Gators, as a going concern, to include all equipment, inventory and supplies, furniture, fixtures, and amenities. (Plaintiff's Complaint)

7. The above-referenced terms and conditions were integrated into a contract for sale and signed by the parties, September 24, 2004. (Plaintiff's Complaint)

8. Incident to the negotiations on the contract for sale, V Restaurants and Saele negotiated a $30,000.00 payoff of the *$104,253.57* lease arrearage with Spectrum, a

$30,000.00 payoff of the $80,000.00 debt to Regions Bank, and an anticipated $30,000.00 settlement of the *$106,425.71* debt to the Internal Revenue Service. (Plaintiff's Complaint)

9.  The Internal Revenue Service lien encumbering the restaurant property was in place and enforceable. These liens were never released nor did Mr. Goodwyn have the liens released as of the October 22, 2004 performance date as required by the letter of understanding. (Goodwyn deposition page 50 – 53)

10. The Regions Bank lien was not released as of the October 22, 2004, date nor did Mr. Goodwyn have an agreement with Regions to release said liens upon payment of $30,000 to Regions as of October 22, 2004 as required by the letter of understanding. (Goodwyn deposition page 50 – 53)

11. Incident to the contract for purchase of Gators, Goodwyn verbally agreed to allow V Restaurants and Saele to take possession of the restaurant, pending approval of the application to the Internal Revenue Service. (Plaintiff's Complaint)

12. Following the signing of the letter of understanding on September 24, 2004, and the agreed date upon which the transfer was to take place, October 22, 2004, Robert J. Russell, Jr. made a number of phone calls to Mr. Memory's office to determine the progress of efforts on behalf of Mr. Goodwyn to clear the liens and encumbrances in question. Through-out all of theses calls Mr. Russell was never provided any assurance that the subject liens and encumbrances (Federal Tax lien and Regions lien) were being addressed by Mr. Goodwyn, nor did he have the financial ability to do so. (Affidavit of Robert J. Russell, Jr.)

13. V Restaurants and Saele signed a contract for sale, September 24, 2004. Incident to the instant contract, V Restaurants and Saele agreed, among other things, to purchase the going concern of Gators for $90,000.00. (Plaintiff's Complaint)

14. During the course of negotiations for the letter of understanding dated September 24, 2004, there were no misrepresentations made to the Plaintiff by the Defendants. (Goodwyn deposition page 80 - 82)

15. V Restaurants and Saele assumed possession before the sale was closed. (Plaintiff's Complaint)

16. Incident to the instant contract V Restaurants and Saele agreed to purchase the going concern of Gators for $90,000.00. (Plaintiff's Complaint)

17. Phillip Goodwyn is not aware of any agreement between or among the Defendants that may have caused him any harm. (Goodwyn deposition page 85 - 87)

18. Other than Simple Pleasures being unable to sell the Gator's restaurant to the Defendant, Mr. Goodwyn has no evidence that there was an agreement between anyone to support the conspiracy count. (Goodwyn deposition page 88 - 89)

**RESPECTFULLY SUBMITTED** this the 14th day of March, 2006.

/s/ **Daniel G. Hamm**

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE
DEFENDANTS, V RESTAURANTS,
INC AND VINCE SAELE
560 SOUTH MCDONOUGH STREET
SUITE A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

# CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this **Motion for Summary Judgment** by electronic transmission or by placing a copy in the United States Mail with sufficient postage for first class delivery to the attorneys named below or parties if not represented by counsel.

**DONE** this the 14th day of March, 2006.

**/s/ Daniel G. Hamm**

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE
DEFENDANTS, V RESTAURANTS,
INC AND VINCE SAELE
560 SOUTH MCDONOUGH STREET
SUITE A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX               334-323-5666

Von Memory
James Day
469 S. McDonough Street
Montgomery, Alabama 36104

**SIMPLE PLEASURES, INC.**

**v.**

**V RESTAURANTS, INC., et al.**

**PHILLIP  GOODWYN**

**February 17, 2006**

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

   FOR THE MIDDLE DISTRICT OF ALABAMA

            NORTHERN DIVISION

 IN RE:

 PHILLIP GOODWYN,      CASE NO.

      Debtor.          05-32325-WRS

 SIMPLE PLEASURES,     CHAPTER 7

 INC.,

       Plaintiff,

 vs.                   ADVERSARY

 V RESTAURANTS, INC.,  PROCEEDING NO.

 ET AL,                05-03062

       Defendants.

        *    *    *    *    *    *


   DEPOSITION OF PHILLIP GOODWYN,

 VOLUME I, taken pursuant to notice and

 stipulation on behalf of the

 Defendant, in the Law Office of Von G.

 Memory, P.A., 469 South McDonough

 Street, Montgomery, Alabama 36104,

 before Aimee French, Court Reporter

 and Notary Public in and for the State

b4ce0427-0b12-4d29-a34d-e5e61109eba8

## PHILLIP GOODWYN - 2/17/2006

**Page 2**

1  of Alabama at Large, on February 17,
2  2006, commencing at 10:14 a.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 4**

1              INDEX
2
3  EXAMINATION OF PHILLIP GOODWYN
4
5  EXAMINATION BY:          PAGE NUMBER
6
   Mr. Hamm....................7
7
8       E X H I B I T S
9  Exhibit 1...................33
10
11
12
13
14  CERTIFICATE OF REPORTER.....91
15  WORD INDEX...................
16
17
18
19
20
21
22
23

**Page 3**

1          APPEARANCES
2
3  FOR THE PLAINTIFF:
4      VON G. MEMORY, ESQ.
5      MEMORY, DAY & AZAR
6      469 SOUTH MCDONOUGH STREET
7      POST OFFICE BOX 4054
8      MONTGOMERY, AL 36104
9
10
11  FOR THE DEFENDANT:
12      DANIEL G. HAMM, ESQ.
13      560 SOUTH MCDONOUGH STREET
14      SUITE 8
15      MONTGOMERY, AL 36104
16
17      D. COLEMAN YARBROUGH, ESQ.
18      2860 ZELDA ROAD
19      MONTGOMERY, AL 36106
20
21  ALSO PRESENT:  Mr. Vince Saele
22
23

**Page 5**

1          STIPULATIONS
2          It is hereby stipulated and
3  agreed by and between counsel
4  representing the parties that the
5  deposition of PHILLIP GOODWYN is taken
6  pursuant to notice and stipulation on
7  behalf of the Defendant; that all
8  formalities with respect to procedural
9  requirements are waived; that said
10  deposition may be taken before Aimee
11  French, Court Reporter and Notary
12  Public in and for the State of Alabama
13  at Large, without the formality of a
14  commission; that objections to
15  questions, other than objections as to
16  the form of the questions, need not be
17  made at this time, but may be reserved
18  for a ruling at such time as the
19  deposition may be offered in evidence
20  or used for any other purpose as
21  provided for by the Civil Rules of
22  Procedure for the State of Alabama.
23          It is further stipulated and

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 6

1  agreed by and between counsel
2  representing the parties in this case
3  that the filing of the deposition of
4  PHILLIP GOODWYN is hereby waived and
5  that said deposition may be introduced
6  at the trial of this case or used in
7  any other manner by either party
8  hereto provided for by the Statute,
9  regardless of the waiving of the
10 filing of same.
11         It is further stipulated and
12 agreed by and between the parties
13 hereto and the witness that the
14 signature of the witness to this
15 deposition is hereby waived.
16
17
18
19
20
21
22
23

Page 7

1            PHILLIP GOODWYN,
2     after having been first duly sworn
3     under oath, was examined and testified
4     as follows:
5     EXAMINATION BY MR. HAMM:
6  Q.  Mr. Goodwyn, my name is Dan Hamm.  I'm
7     going to be asking you some questions.
8     You've taken a deposition in this case
9     before; is that correct?
10 A.  Yes.
11         MR. HAMM:  Mr. Memory -- and I
12     guess Mr. Goodwyn will be rendering
13     testimony on behalf of Simple
14     Pleasures, Incorporated also?
15         MR. MEMORY:  That's correct.
16         MR. HAMM:  Very well.
17 Q.  (BY MR. HAMM) Mr. Goodwyn, at any
18     time if you do not understand my
19     questions, please ask me to rephrase
20     the question, and I'll be glad to.
21     First of all, would you give us your
22     name and your address?
23 A.  Phillip Lightfoot Goodwyn, 1533 Gilmer

Page 8

1     Avenue, Montgomery.
2  Q.  And your last name is G -- would you
3     spell your name?
4  A.  G-O-O-D-W-Y-N.
5  Q.  And, Mr. Goodwyn, how are you employed
6     today?
7  A.  Entec Stations.  I'm supervisor of
8     food service.
9  Q.  And how long have you been so
10     employed?
11 A.  A month and a half, November of 2004.
12 Q.  And you work at a particular station
13     or not?
14 A.  No.  I'm in the corporate office.
15 Q.  And where is that located?
16 A.  On Zelda Road.
17 Q.  Here in Montgomery?
18 A.  Correct.
19 Q.  And once again, what are you doing for
20     Entec?
21 A.  I developed a -- I'm in charge of
22     their food service development and
23     their fountain drinks and their

Page 9

1     coffees and marketing.
2  Q.  How were you employed prior to your
3     employment with Entec?
4  A.  As soon as I finished helping Vince
5     finish some catering parties, when I
6     finished my commitment --
7  Q.  That would be Mr. Saele?
8  A.  Mr. Saele.  Once I had finished
9     helping him through October, I went to
10     work immediately with them.
11 Q.  October of 2005?
12 A.  4.
13 Q.  2000 -- okay.  I thought you -- did
14     you not say a few moments ago that you
15     had been with Entec a month and a
16     half?
17 A.  No, no.
18 Q.  I'm sorry.
19 A.  A year and -- a year since -- I've
20     been there since November of 2004.
21 Q.  Okay.
22 A.  I think that's what I said.
23 Q.  And prior to your employment with

3  (Pages 6 to 9)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP GOODWYN - 2/17/2006

Page 10

1    Entec, you were employed how?
2  A.   I was the owner of Gator's.
3  Q.   The restaurant that is the subject of
4      this litigation --
5  A.   Correct.
6  Q.   -- is that correct?
7  A.   Simple Pleasures, Inc.
8  Q.   You were the owner of Simple
9      Pleasures, Incorporated?
10  A.   Correct. Or president.
11  Q.   Well, did you own all the stock?
12  A.   Yes.
13  Q.   No other stockholders?
14  A.   No other stockholders.
15  Q.   And how long had Simple Pleasures been
16      in business?
17  A.   '92. It opened as Hillwood Cafe in
18      Vaughn Plaza -- I mean, not in Vaughn,
19      in Hillwood Festival Shopping Center.
20  Q.   And how did it come to be Gator's?
21  A.   Ed needed -- Ed Fatzinger needed a
22      tenant over at -- in Vaughn Plaza, and
23      he had lost the tenant there, and so I

Page 11

1      developed a business. I wanted to get
2      away from Hillwood, which I was
3      operating at that time, into a bigger
4      market, which that area seemed to be.
5      Things were going west -- east, and so
6      we just came up with a name.
7  Q.   Was the nature of the business
8      operated as Simple Pleasures,
9      Incorporated operated at Hillwood?
10  A.   Similar, very similar to what Gator's
11      was, which is a meat and three,
12      lunch/vegetable thing and then a
13      nicer, upscale dinner with seafood, so
14      very similar style of restaurant.
15  Q.   And how long did Simple Pleasures
16      operate the location that you term as
17      Hillwood?
18  A.   Hillwood Cafe, I operated it from --
19      for three years I owned it. It was
20      about three years. The last six
21      months, when I opened Gator's, I owned
22      both of them at the same time. And
23      Gator's -- the financial stress of

Page 12

1      both and management, my lack of
2      ability for management style,
3      probably, forced me into selling
4      Hillwood to the manager of Hillwood,
5      so I could operate only one.
6  Q.   You were operating at the Hillwood
7      location or Simple Pleasures was
8      operating the Hillwood location for
9      three years, did you testify to
10      earlier?
11  A.   I believe that's correct.
12  Q.   And that would have been, what, 1995
13      or --
14  A.   '95.
15  Q.   Okay. And when did Gator's open?
16  A.   Well, '92, it was the end of '92. So
17      really '93 was when Hillwood -- so it
18      would have been, you know,
19      three-and-a-half years, approximately
20      more like three-and-a-half years that
21      I operated Hillwood, owned and
22      operated. I had Gator's for almost
23      nine years.

Page 13

1  Q.   And there was a period of time that
2      they ran -- both businesses were
3      operated?
4  A.   Absolutely, yes, simultaneously,
5      correct.
6  Q.   Okay. Do you know how long that was
7      for?
8  A.   Approximately six months.
9  Q.   Why did you wish to leave the Hillwood
10      location?
11  A.   Hillwood has no evening traffic at all
12      down Zelda at that time. It was very,
13      very limited evening traffic, and it
14      is a small restaurant that didn't
15      allow us to do the volume we felt
16      necessary to perform lunch properly.
17  Q.   With respect to Simple Pleasures,
18      Incorporated, the profitability
19      stemming from the Hillwood location,
20      can you give me an idea as to what
21      that looked like?
22  A.   Absolutely.
23  Q.   Okay.

4 (Pages 10 to 13)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 14

```
 1  A.   When I took over -- when we took over,
 2       I got into something that I didn't
 3       know I was getting into.  I was very
 4       young in the business --
 5  Q.   When you took over --
 6  A.   -- meaning when I took over Hillwood.
 7       When I bought Hillwood, Ed Fatzinger
 8       came and got me to buy Hillwood as it
 9       was from Gail Snyder and her group
10       that went eventually down the street.
11       I thought I was buying a restaurant,
12       in turn I was really buying a
13       nightclub with a loyal following to
14       Gail Snyder.  When -- she did
15       everything in her power to destroy --
16       she told me to destroy the business
17       that I had purchased from her, even as
18       going as far as -- I mean, just -- it
19       was unbelievable.  So when she
20       actually opened up --
21  Q.   My --
22  A.   I'm going to give it to you in one
23       second.  I'll be finished.
```

Page 15

```
 1           MR. MEMORY:  Okay.  Make it
 2       short and move on.
 3           THE WITNESS:  All right.
 4           MR. MEMORY:  We're not
 5       interested in the history.
 6  A.   It went -- we had very few customers.
 7       The financial statements were in
 8       trouble until we built it up to a
 9       level of profitability.  But we
10       started from very low and in serious
11       debt, and then we pulled it -- I
12       pulled it out of debt over the three
13       years.
14  Q.   (BY MR. HAMM)  Did Simple Pleasures,
15       Incorporated file tax returns for the
16       years of '93, '94, and '95?
17  A.   Correct.
18  Q.   Okay.  What would be the net income
19       for Simple Pleasures, Incorporated in
20       those three years, that you recall?
21  A.   Big losses, losses in '92, '93 and
22       profit in '94 -- or '93, '94, and
23       profits in '95.  It would be the third
```

Page 16

```
 1       year before we made profits.
 2  Q.   With respect to the 1995 year, do you
 3       remember a figure that Simple
 4       Pleasures, Incorporated would have
 5       enjoyed as far as net income as
 6       reflected on the federal tax return?
 7  A.   The '94 showed like a $60,000 profit.
 8       '95 did not show a profit because
 9       we -- because the investment -- or it
10       showed a flat profit, a very close
11       profit, because it invested or was
12       investing in all of the purchase of
13       Gator's, and Gator's construction was
14       going on at that time.  So it did show
15       a profit, but it was a -- and I don't
16       recall what it was -- but it was not a
17       cash flow, a negative cash flow.
18  Q.   Really, Mr. Goodwyn, let me ask you.
19       What I'm asking about are some numbers
20       on the bottom of the tax return.
21           MR. MEMORY:  Listen, you
22       didn't ask for them.  He's sitting
23       here doing the best that he can.
```

Page 17

```
 1           MR. HAMM:  If he recalls.
 2       I'm asking for those numbers.
 3  A.   I don't know.  I don't know.  I can't
 4       recall exactly.
 5  Q.   (BY MR. HAMM)  You don't recall the
 6       numbers?
 7  A.   I do not recall what they were, no.
 8           MR. MEMORY:  Sitting there
 9       lecturing him.
10  Q.   (BY MR. HAMM)  You feel that '95 was
11       profitable?
12  A.   It was profitable, correct.  There's a
13       difference in cash flow and
14       profitable.  We were spending cash
15       developing Gator's at the same time we
16       were making a profit.  We were out
17       spending our profit.  Was cash flow
18       positive during '95, no.
19  Q.   You were devoting -- any profit that
20       may have stemmed, you were devoting it
21       to the new location, Gator's?
22  A.   Absolutely.
23  Q.   Okay.  And do you have any idea as to
```

5 (Pages 14 to 17)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN – 2/17/2006

Page 18

1    what money that may have been?
2  A.   No.
3  Q.   You indicated earlier that 1994 had a
4      profit of $60,000.  Would it have been
5      in that neighborhood or a greater
6      amount?
7  A.   It would have been a greater amount.
8  Q.   And your position is that the Hillwood
9      location was generating $60,000, the
10     profit, in '94 and a greater amount in
11     '95?
12 A.   Something like that.  I don't recall
13     exactly.
14 Q.   Okay.  Were you taking a salary out of
15     the Hillwood location in '94 and '95?
16 A.   Yeah, I believe I was, yes.
17 Q.   So consequently, the $60,000 and the
18     greater figure for '95 would have been
19     after your salary; is that correct?
20 A.   Yes, if it showed -- when it showed a
21     profit of $60,000, it would not have
22     been a -- if when we showed a profit,
23     it would not have been a cash flow

Page 19

1      profit because it would have been
2      paying off debt.  But, yes, we may
3      have shown a profit during that time,
4      60,000 plus my profit -- I would have
5      had 30,000.
6  Q.   And your salary as you recall would
7      have been a $30,000 range?
8  A.   Uh-huh.
9  Q.   And then you opened Gator's in '90 --
10 A.   Or $24,000, I think, at that time.
11 Q.   Then you opened Gator's?
12 A.   Right, correct.
13 Q.   In '96?
14 A.   I'd have to look at the lease.  It was
15     '95 and 6, something like that.
16 Q.   Do you recall what period of time that
17     you ran these two businesses together?
18 A.   About six months.
19 Q.   Okay.  And then you vacated Hillwood?
20 A.   Yes.
21 Q.   Was there any unpaid obligations from
22     the Hillwood location as you recall?
23 A.   All of those -- any obligations,

Page 20

1      Hillwood, were absorbed by Simple
2      Pleasures, Inc. and followed on to
3      Gator's.
4  Q.   But there were unpaid obligations
5      associated with the Hillwood location?
6  A.   Yes, there were still outstanding
7      debts.
8  Q.   Were they just the trade payables, or
9      --
10 A.   Trade payables, you know --
11 Q.   Anything in addition to that?
12 A.   It could have been some additional
13     rent left.  I don't know.  It was just
14     trades, trade payments.
15 Q.   I mean, would it have been routine
16     rent or would it have been an
17     arrearage?
18 A.   It may have been.  I can't recall.  We
19     stayed --
20 Q.   I'm sorry?
21 A.   We stayed a little bit in arrears with
22     Ed for years since we opened Hillwood.
23     I've never been current.

Page 21

1  Q.   With respect to the Gator's location,
2      what was your experience with -- or
3      what was Simple Pleasures' experience
4      with respect to its profitability in
5      the year of '95, '96, '97, '98, those
6      years?
7  A.   Until we expanded into the bar and
8      made it larger, it was not -- it was
9      marginally profitable based on lunch.
10     But when we expanded the bar, it
11     became much more profitable.
12 Q.   And can you give me a time frame for
13     that?
14 A.   After two years, the second year.
15 Q.   '97, '98?
16 A.   '97, something like that.
17 Q.   And did there come a time that you
18     wanted to get out of the restaurant
19     business at the Vaughn Plaza, at the
20     Gator's location?
21 A.   There was a time from the day I got
22     into Hillwood that I wanted out, yes.
23 Q.   Okay.  But my question with -- while

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 22

1    you were in the Gator's location?
2  A.   From then on, since I've been in the
3    restaurant business, I wanted out.
4  Q.   Okay.  What did you do to get out?
5    What efforts did you take to get out
6    of this restaurant business?
7  A.   The wrong direction.  I was trying to
8    find managers and bring people in like
9    Vince to buy the business or to take
10    it over, to manage it, to become a
11    partner, you know, and the deal would
12    be they would come on and then they
13    could end up getting or buying me out
14    and I would leave.  I found the
15    restaurant business very difficult to
16    maintain a family life the way I'd
17    like to, so it was always a pursuit of
18    trying to find somebody.
19            But in lieu of that, what
20    I ended up doing was, I was going to
21    then expand it.  I found it as running
22    faster to generate more cash flow to
23    keep creditors and to pay things back

Page 23

1    and to try to be able to hire managers
2    and get out that way.
3  Q.   You mentioned earlier that you were
4    trying to find others that were to buy
5    the business or come in.
6  A.   Like Hillwood, when I did Hillwood.
7  Q.   With respect to Gator's, did you go to
8    any other people attempting to or
9    solicit other offers on the purchase
10    on the Gator's business?
11  A.   In 2003, when we closed, I did.  I
12    actively went out and tried to find
13    people to purchase it.
14  Q.   Did you find anybody?  Were there any
15    offers tendered?
16  A.   There were no official offers
17    tendered, no.
18  Q.   And this is in 2003 that you closed
19    the business?
20  A.   Correct.
21  Q.   For what period of time was it closed?
22  A.   Two weeks.
23  Q.   And what was the reason it was closed?

Page 24

1  A.   Financial distress.
2  Q.   Well, I understand that's the result,
3    but what factors?  What factors caused
4    you -- was it a threatened levy,
5    seizure?
6  A.   I opened up a seafood market next
7    door, and that drew down on me
8    financially and very, very heavily.
9    We had spent too much money, $200,000,
10    on it.  We spent a lot of money on it.
11    Theft, because of it, had me overly
12    divided, and theft had run out of
13    control.  The management was out of
14    control.  And that's what drove the
15    problem, and until I regained control
16    and I reopened and let go of
17    management, is when it came back to
18    the financial profitability that it
19    had shown prior to me opening that
20    seafood market.
21  Q.   Let me see if I understand you.  You
22    closed in 2003, sometime during the
23    2003 period.

Page 25

1  A.   October.
2  Q.   October of 2003.  And you reopened and
3    enjoyed a period of profitability?
4  A.   Correct.  I reopened and was managing
5    to pay back some of the IRS debts and
6    some of my suppliers' debts, and we
7    had regained profitability once I
8    reopened, and almost virtually
9    immediately once I reopened.
10  Q.   Following the reopening or following
11    October 2003, did you go through any
12    type of business reorganization or
13    bankruptcy proceedings of any type
14    with --
15  A.   I had begun discussing it with Von.
16    When I closed, I had meetings with him
17    regarding my options on bankruptcy or
18    how to get this stuff paid back, but
19    my goal was to take care of Ed
20    Fatzinger and my debts to people that
21    I had, debts to -- as to try to figure
22    out how to get them taken care of.
23  Q.   There was no bankruptcy petition filed

7 (Pages 22 to 25)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP    GOODWYN − 2/17/2006

Page 26

1      --
2   A.   No.
3   Q.   -- in October of 2003 for Simple
4        Pleasures, Incorporated?
5   A.   No.
6   Q.   Has there ever been a bankruptcy
7        petition involved for Simple
8        Pleasures, Incorporated?
9   A.   There was -- we -- October of 2005.
10       We had to go ahead and do bankruptcy
11       because of the Region's.
12             MR. MEMORY:  Listen to his
13       questions.
14             THE WITNESS:  Oh, I'm sorry.
15             MR. MEMORY:  He's asking about
16       the corporation.
17             THE WITNESS:  The corporation,
18       yes.
19   Q.   (BY MR. HAMM)  But the bankruptcy in
20       2005 was an individual bankruptcy; is
21       that correct?
22   A.   Yes.
23   Q.   It was not for the corporation then?

Page 27

1   A.   Not for the corporation.  Sorry.
2   Q.   So in essence --
3   A.   No, and I don't know.
4   Q.   -- my question is:  There has been no
5        bankruptcy petition --
6   A.   No, no.
7   Q.   -- to Simple Pleasures, Incorporated?
8   A.   Correct.
9   Q.   You mentioned earlier some internal
10       service or -- I'm sorry -- some debt
11       to the Internal Revenue Service.
12   A.   Correct.
13   Q.   Tell me about this.
14   A.   Payroll and other -- the payroll tax
15       not submitted on time or not sent --
16       not the full amount from 2003.
17   Q.   That was a withholding tax obligation?
18   A.   Um-hmm.
19   Q.   Was there any income tax obligations?
20   A.   No.
21   Q.   Withholding loan.  Were liens -- did
22       the Internal Revenue Service file
23       liens in this case?

Page 28

1   A.   No, they had not filed liens at that
2        time, no.
3   Q.   Did the Internal Revenue Service file
4        liens at some point in time?
5   A.   Yes, I believe so.
6   Q.   And -- you think so or you know so?
7   A.   I'm sure they did.  I mean, I -- yes,
8        I believe so.
9   Q.   Okay.  Do you know how much the
10       Internal Revenue Service claims they
11       are owed today?
12   A.   I believe a total somewhere around
13       $80,000.
14   Q.   Has there been a responsible party
15       assessment stemming from that
16       withholding tax obligation against you
17       personally?
18   A.   No.
19             MR. MEMORY:  He doesn't know
20       what you're asking.
21             THE WITNESS:  Uh-uh.
22   Q.   (BY MR. HAMM)  Did you understand my
23       question about the responsible party

Page 29

1        assessment?
2   A.   No -- I mean, I guess I don't, really.
3   Q.   Has the IRS -- are they looking to you
4        individually for the withholding taxes
5        stemming from Simple Pleasures,
6        Incorporated?
7   A.   Yeah, they're looking for me for the
8        money, yes.  Certainly, yeah.
9   Q.   In other words, Simple Pleasures,
10       Incorporated is not the only one
11       liable today?
12   A.   Correct, yes.
13   Q.   Phillip Goodwyn himself is liable
14       also?
15   A.   Yes.
16   Q.   Okay.  How about the Alabama State
17       Department of Revenue?  Are there any
18       tax obligations?
19   A.   No.
20   Q.   How about Montgomery County?
21   A.   No.
22   Q.   City of Montgomery?  Sales taxes paid?
23   A.   No.  All sales taxes paid.

8  (Pages 26 to 29)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 30

1    Q.    Have there ever been any liens or any
2          amounts owed those people beyond the
3          period of time in which they were to
4          be paid?
5    A.    Have I -- I have with the State of
6          Alabama in the 2003.  I owed them
7          $2100, something like that, and I paid
8          it.
9    Q.    Okay.  Most of them have been paid in
10         a timely fashion that would prevent a
11         lien from being filed; is that
12         correct?
13   A.    Absolutely.
14   Q.    Okay.  And the Internal Revenue
15         Services is, as far as you know today,
16         are the only one that has filed a
17         lien?
18   A.    Correct.
19   Q.    You have filed a lawsuit.  Have you
20         had an opportunity to review the
21         lawsuit --
22   A.    Yes.
23   Q.    -- that has been filed in this case?

Page 31

1    A.    Um-hmm.
2    Q.    And you have read the lawsuit?
3    A.    Yes.
4    Q.    Do you understand what is being said
5          in this lawsuit?
6    A.    Um-hmm.
7    Q.    Let me ask you some questions about
8          this lawsuit.  You have alleged a
9          breach of contract that Mr. Saele and
10         V Restaurants, Incorporated --
11   A.    Correct.
12   Q.    -- have breached a contract, an
13         agreement, that you had with them --
14   A.    Um-hmm.
15   Q.    -- you and Simple Pleasures,
16         Incorporated had with them.  Can you
17         tell me how that occurred and what
18         facts you know about that?
19   A.    There were -- I hired or requested
20         Vince come in as a -- you want just
21         the contract, discuss just the
22         contract?
23   Q.    I want what facts support --

Page 32

1    A.    The contract -- Vince and I sat down
2          on the 24th.  He brought in this
3          contract.  He'd been frustrated we had
4          not -- the attorneys had not gotten
5          all together on everything.  He wanted
6          to take control of the business.  I
7          wanted him to take control of the
8          business.  We were waiting for the
9          inevitable from the IRS and from
10         Region's.  They were willing, by all
11         indications, were -- had expressed
12         willingness to meet us on the
13         agreement to the $30,000 for each, and
14         Ed Fatzinger is -- my understanding
15         and I had spoken to Ed, that he was in
16         all -- full agreement with this --
17         with this contract.
18   Q.    Hold on.  That's Mr. Memory's.  Go
19         ahead.  Keep talking.
20   A.    And all that we were going to be
21         waiting for is he -- I was giving him
22         the keys and we were going to be
23         waiting for getting the full release,

Page 33

1          and I was going to be responsible for
2          making sure that he had full release.
3
4          (Whereupon, Exhibit No. 1 was marked
5          for identification.)
6
7    Q.    (BY MR. HAMM) Let me show you an item
8          that I have marked as Exhibit No. 1.
9          Does that document look familiar to
10         you?
11   A.    Yes.
12   Q.    Can you tell me what that --
13   A.    This is an agreement that Vince, with
14         V Restaurants, and I, representing
15         Simple Pleasures, Inc., were in
16         agreement to.
17   Q.    And is that your signature on the
18         bottom or --
19   A.    Yes, it is.
20   Q.    -- or half way down the second page?
21   A.    Yes, that's mine.
22   Q.    Okay.
23            MR. HAMM:  Mr. Yarbrough, this

9  (Pages 30 to 33)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

## PHILLIP GOODWYN - 2/17/2006

Page 34

1    is the copy of the --
2        MR. YARBROUGH:  Yeah, I've got
3    it.
4        MR. HAMM:  You've got a copy?
5        MR. YARBROUGH:  That's the
6    same thing that was just introduced in
7    the other deposition, isn't it, 24th
8    letter?
9        MR. HAMM:  Yeah.
10  Q.  (BY MR. HAMM)  Mr. Goodwyn, you're
11    signing for Simple Pleasures,
12    Incorporated down here at the bottom
13    of this document?
14  A.  Right.
15  Q.  And is it this agreement, dated
16    September the 24th, 2004, which is
17    marked as Exhibit No. 1, is this the
18    agreement -- is this the agreement
19    that you and Mr. Saele had?
20  A.  Correct.
21  Q.  Acting on behalf of each of your
22    corporations?
23  A.  Correct.

Page 35

1  Q.  Is it this agreement that was
2    breached?
3  A.  Yes.
4  Q.  Okay.  Were there -- are there any
5    other terms other than what is
6    reflected in this document to y'all's
7    agreement?
8  A.  When we were discussing leading up to
9    this document, when we were working on
10    past agreements so implied or
11    discussed, we were lining out areas
12    that I would be allowed to go into in
13    order to make a living and the
14    original documents which referenced
15    any food service, and that's where we
16    had problems, and it turned out that
17    Vince and I were in a complete
18    understanding that existing Gator's
19    customers, ones that I had done
20    catering for in the past, any existing
21    clients, that they were actually
22    actively doing any catering for, that
23    I would not do any work for unless I

Page 36

1    did it in his behalf.  And I did
2    express at that time that I had one
3    wedding obligation that I had to make
4    sure, and he had to fulfill these
5    other -- he had to fulfill these other
6    catering jobs that were coming up, and
7    then he would pay me a percentage for
8    helping him execute those catering
9    jobs.
10        So that was another
11    agreement that we both -- we were on
12    the understanding that I was going to
13    help him finish these because that was
14    my reputation.  I had taken those
15    catering parties, and I wasn't going
16    to let them just kind of be not
17    overseen.
18  Q.  Was that agreement, with respect to
19    the catering that you just described,
20    was it before September the 24th or
21    after September the 24th?
22  A.  Well, it was a -- it was before
23    September 24th when he discussed this

Page 37

1    and that we had discussed that he
2    needed help for these parties, and
3    that he was going to pay me a
4    percentage to handle it.  That was the
5    only way, because otherwise he didn't
6    want me involved in the restaurant,
7    and I didn't want to be involved in
8    the restaurant.  He needed to take it
9    over.
10  Q.  With respect to the catering, the
11    other agreement that you're speaking
12    of --
13  A.  Correct.
14  Q.  -- is it addressed in this September
15    24th, 2004 agreement?
16  A.  Yeah, in that it says that catering
17    business operating out of Gator's
18    shall continue but only be operated by
19    its new owners.
20  Q.  Okay.  And were you satisfied with
21    that?
22  A.  Am I satisfied with that?
23  Q.  Were you satisfied with that on

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 38

1    September the 24th, 2004?
2  A.   I was satisfied with the fact that we
3    both had it clear in our head.  We
4    understood that this couldn't cover
5    every contingency.  We didn't have,
6    really, lawyers sitting there bringing
7    it up, but in our head we had clear --
8    he wanted to make sure that the
9    profitability of what he saw of
10   Gator's, that I was not going to
11   undermine his business.  And my job
12   was -- and in my head I was going to
13   do nothing to undermine his business,
14   and that is my -- I was not going to
15   go into business against him, taking
16   his customers, and that was our
17   intention.  And was that addressed?
18   Was it specifically word for word?  Is
19   that what's right here?  That's what
20   our intentions, and that's what the
21   discussions between us were, and
22   that's what I was holding myself to.
23   Does that answer your question?

Page 39

1  Q.   Well, if that's your answer, it
2    answers my question.
3  A.   Um-hmm.
4  Q.   The -- were there any matters
5    unresolved on September the 24th,
6    2004?  Maybe that's the way I should
7    ask the question.
8  A.   That we had left -- no, not that I
9    know of specifically, except for the
10   fact that we said we couldn't transfer
11   title, which was not important -- or
12   not title, but we couldn't transfer
13   money until I was able to deliver him
14   clear title to the equipment.
15  Q.   Okay.  I'm going to cover that.  I
16   understand how that would be a factor,
17   but that is addressed in this document
18   on -- dated September the 24th also, I
19   believe.
20  A.   Right.  But it was -- but we had had
21   an understanding that that would come
22   when it would come; that there was no
23   -- although it requests a closing day,

Page 40

1    we had discussed at that time that it
2    would come when it comes; that I would
3    do everything so he could operate it
4    with no hindrances, and that's what I
5    was doing.
6  Q.   Now, when you say operating with no
7    hindrance, he was doing that at the
8    time, was he not, or thereabouts?
9  A.   No, he wasn't operating -- I mean, he
10   was not operating it, the business,
11   until the day -- I mean, he had been
12   in there helping his manager and doing
13   other things, but he wasn't the man in
14   control of all the deposits, of the
15   money, of all that.
16  Q.   When did that occur?
17  A.   August -- September 24th.
18  Q.   Okay.  I get it.  Maybe we're talking
19   beyond each other, but it occurred on
20   or about September 24th that Mr. Saele
21   took over the business --
22  A.   Correct.
23  Q.   -- is that correct?  Okay.  So is it

Page 41

1    your understanding that paragraph
2    number four of Exhibit No. 1 was
3    somewhat ambiguous between the two of
4    you, or does it -- did you not agree
5    to this?
6        MR. MEMORY:  Object to the
7    form.  Calls for legal conclusion.  Go
8    ahead and you can answer it if you
9    can.
10  A.   It was to me, at the time of this,
11   irrelevant in a point because what was
12   our intentions?  Our intentions were
13   he was going to get a good deal.  He
14   was -- I was going to assist him and
15   have everything he needed to operate
16   that business; that nothing would
17   hinder his operation of the business;
18   and that he would get complete and
19   total access and be able to keep the
20   equipment and everything in place;
21   that nothing would hinder the
22   purchase.
23  Q.   (BY MR. HAMM)  Okay.

11  (Pages 38 to 41)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN – 2/17/2006

Page 42

1  A.   All right? And that -- this, to me,
2       in some respects was just clarifying
3       what our obligations were, and our
4       obligations were:  He was to hand me
5       the money.  He was to make a deal with
6       Ed, and I would deliver him everything
7       in my power.
8  Q.   Okay.  In your deposition -- have you
9       had an opportunity to review your
10      deposition --
11 A.   Um-hmm.
12 Q.   -- given previously --
13 A.   Right.
14 Q.   -- when Mr. Yarbrough took it?
15 A.   Um-hmm.
16 Q.   Did you review that?
17 A.   I read through it quickly.
18 Q.   There were some suggestions, or
19      actually statements, that an agreement
20      was -- occurred on 27th, 2004.  Was
21      there any agreement subsequent to this
22      September the 24th, 2004 document?
23 A.   Between Vince and I?

Page 43

1  Q.   Um-hmm.
2  A.   Now, there was a lease on September
3       27th, I think, between Vince and
4       Spectrum.
5          MR. HAMM:  What page was this?
6          MR. YARBROUGH:  Yeah, it's
7       first reference, page 28 beginning on
8       line 12.
9  Q.   (BY MR. HAMM)  I'm looking at page 28.
10 A.   That would have been September the
11      24th.
12 Q.   Okay.
13 A.   I mean, it may have been Friday.  It's
14      Friday I stated earlier.
15 Q.   So the September 27th date was an
16      error on --
17 A.   It's just a -- yeah.
18 Q.   -- someone's part, either yours or
19      perhaps a court reporter?
20 A.   Right.
21 Q.   Okay.  It should have been September
22      the 24th?
23 A.   Correct.

Page 44

1  Q.   Okay.  Very well.  I just wanted to
2       clear that point up.  There was no
3       agreement subsequent to September the
4       24th?
5  A.   No.
6  Q.   Okay.  Good.  Do you have any
7       indication that Vince Saele would not
8       have paid you $90,000?
9  A.   When he's going to pay me the 60 and
10      -- no.
11 Q.   The purchase price --
12 A.   No.
13 Q.   The consideration would have come
14      across --
15 A.   Absolutely not.
16 Q.   -- with respect to the 90,000; is that
17      correct?
18 A.   No.  I had no indication anyway.
19 Q.   And that is not a basis for your claim
20      with breach of contract, is it, that
21      he didn't have the $90,000 or didn't
22      have the resources to do this, is it?
23 A.   No, that's not.  It's the letter.

Page 45

1  Q.   Okay.
2  A.   I had no indication he was going to
3       breach the contract until Von called
4       me.
5  Q.   Tell me how he breached this contract.
6       And the contract we're speaking of and
7       you're suing about is this September
8       24th, 2004 contract?
9  A.   His attorney sent a letter to Von
10      saying he wasn't going to fulfill the
11      contract.
12 Q.   Okay.  But my question -- the contract
13      that you're suing on, is this the
14      agreement of September the 24th of
15      2004?
16 A.   Correct, or our agreement to fulfill
17      his payment to me.
18 Q.   Okay.  When did you get notice of the
19      breach of the contract?  When were you
20      informed that Vince Saele --
21 A.   Whatever date that Von was aware of
22      that they called me to tell me.  Vince
23      never called me to say there was a

12  (Pages 42 to 45)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN - 2/17/2006

Page 46

1    problem, we were running in trouble,
2    because I need to have this -- we have
3    a timeline.  There was no discussion
4    that I was in any way, form, or
5    fashion creating any problem or
6    hindrance to him or that he was having
7    a problem and was going to breach the
8    contract.  No one called, said
9    anything that there was a problem.
10  Q.   Well, with respect to paragraph four
11       on the October 22nd, 2004 date, you
12       did not regard that as being a
13       condition of the contract?
14  A.   It wasn't relevant to him operating
15       the business, so I had delivered him
16       -- the business had delivered
17       everything.  It was not -- in other
18       words, the business wouldn't shut down
19       operation.  He wouldn't lose anything.
20       There was nothing -- there was nothing
21       hindering him, so it was irrelevant as
22       far as I was concerned.  I had signed
23       over -- went to the ABC board, signed

Page 47

1    over phone numbers, given anything --
2    anything he'd ask for he got.
3  Q.   Well, let me ask:  On September the
4       24th, where was this contract signed
5       by you and Mr. Saele?
6  A.   In the office at Gator's.  It's a --
7  Q.   Did you have an attorney prior to this
8       date, September 24th, 2004?
9  A.   I did.
10  Q.   And let me ask:  Who was that
11       attorney?
12  A.   Von Memory.
13  Q.   Was Mr. Memory present during that
14       meeting?
15  A.   No, no, he was not.
16  Q.   Okay.  Were you precluded from talking
17       with Mr. Memory on that day, September
18       the 24th, 2004, or prior to signing
19       this document?
20  A.   On this -- he was -- he was out of
21       town or unavailable, and I was
22       probably in poor judgment signing
23       anything without an attorney present.

Page 48

1  Q.   Did he -- were you under any kind of
2       duress on September the 24th, 2004,
3       when you executed --
4  A.   Why did I --
5  Q.   No.  Were you in any kind of duress?
6       Did anything force you to sign?
7  A.   No.
8  Q.   No one forced you to sign this
9       document?
10  A.   No.
11  Q.   Did anyone prevent you from reading
12       this document before you signed it?
13  A.   No.
14  Q.   And you were not incapacitated in any
15       matter, and you understood what you
16       were signing; is that correct?
17  A.   Correct.
18  Q.   But you just did not feel the October
19       27th -- I'm sorry -- October 22nd,
20       2004 date was operative?
21  A.   I don't know if I looked back --
22       reading back over it, I don't think I
23       was much aware of that date after the

Page 49

1    fact.  I didn't look back at this
2    document each week to say where are we
3    on time.  I had turned over everything
4    for his operation.  He was operating.
5    There were no hindrances.  We were --
6    I had spoken to him a number of times
7    saying we're getting ready to get
8    these documents back for full release,
9    so I had told Vince that we were just
10   waiting on this.  There is no problem.
11  Q.   Let me ask:  Had Region's agreed to
12       accept $30,000 at -- let's say
13       September the 24th, 2004?
14  A.   We have a formal at a particular time.
15  Q.   I'm sorry?
16  A.   There was a formal agreement at a
17       particular time, but we had had
18       discussions that they would -- that it
19       would -- in all likelihood they were
20       going to accept the $30,000.
21  Q.   When did you have a definitive
22       agreement from Region's Bank that they
23       would accept 30,000 and release

13  (Pages 46 to 49)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN – 2/17/2006

Page 50

1    whatever claims they had to the
2    equipment and the furniture and
3    fixtures?
4  A.   Two weeks or something after this, I'm
5    not sure, we had a document to --
6  Q.   There was a letter coming from
7    Region's --
8  A.   Correct.
9  Q.   -- telling you such?
10 A.   Yes, there's a letter.
11 Q.   Okay.  That upon payment of $30,000
12    they would release --
13 A.   Correct.
14 Q.   -- their claims to the furniture and
15    fixtures within the Gator's
16    restaurant?
17 A.   Correct.
18 Q.   With respect to the Internal Revenue
19    Service, when did you receive
20    indication that they would release
21    their claims too?
22 A.   I recall somewhere in November,
23    mid-November.

Page 51

1  Q.   Did you receive a formal document -- a
2    document from the Internal Revenue
3    Service?
4  A.   I wasn't -- that was being handled by
5    my attorney.
6  Q.   Okay.  Have you been informed or has
7    Simple Pleasures been informed?
8         MR. MEMORY:  Don't go out that
9    way.
10 A.   No -- I mean, I don't know.
11        MR. MEMORY:  You can't talk
12    about what the two of us talk about.
13        THE WITNESS:  Right.
14 A.   I don't know what transpired between
15    my attorney and the IRS exactly.
16 Q.   (BY MR. HAMM) Did you give the
17    Internal Revenue Service 2848 for your
18    authorizing them to work with your
19    counsel?
20 A.   Yes.
21 Q.   Okay.  Did the Internal Revenue
22    Service send you a letter spelling out
23    or detailing any terms upon which they

Page 52

1    would release their claim to this
2    furniture and fixtures?
3  A.   Not that I know of.
4  Q.   Let me ask you this:  Do you continue
5    to get correspondence from the
6    Internal Revenue Service --
7  A.   Yes.
8  Q.   -- even today?
9  A.   Correct.
10 Q.   Even though you've executed the 2848
11    with your counsel; is that correct?
12 A.   Yes.
13 Q.   Or you've executed 2848 to the
14    Internal Revenue Service?
15 A.   Yes.
16 Q.   You still get all correspondence from
17    the Internal Revenue Service, don't
18    you?
19 A.   Yes, right.
20 Q.   Have you ever received a letter from
21    the Internal Revenue Service saying
22    that they would release the lien?
23 A.   No, not that I know of.

Page 53

1  Q.   Okay.  Let me ask:  On October the
2    22nd or November the 15th or any date
3    subsequent to that, how did you plan
4    to carry this transaction out?
5  A.   We were waiting for their approval of
6    acceptance of the offer, which we had
7    been given some reason that they would
8    be looking at it favorably.
9  Q.   How did you anticipate this
10    transaction taking place?  I mean,
11    would it be with Mr. Saele paying
12    $60,000 cash, and you heard the
13    testimony earlier, him assuming a note
14    of $30,000 --
15 A.   Correct.
16 Q.   -- and that money being held someplace
17    pending IRS approval?
18 A.   No.  I was planning to sit down with
19    the attorneys.  He hands over the
20    check, we hand over the release of the
21    equipment from anything.
22 Q.   So you expected the Internal Revenue
23    Service to release their lean prior to

14  (Pages 50 to 53)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN – 2/17/2006

Page 54

1    receiving $30,000?
2  A.   Or a letter of acceptance of some
3    sort.  We had the letter of acceptance
4    from Region's, and I was waiting for
5    that.
6  Q.   Had Spectrum Development agreed to
7    accept the $30,000 in --
8  A.   Yes, it was --
9  Q.   It was a note; is that correct?
10 A.   A note.
11 Q.   And they had agreed to that?
12 A.   They agreed to accept what Region's
13   and the IRS were getting, and that was
14   $30,000.
15 Q.   And would that serve to release you
16   from the entire lease arrearage?
17 A.   Yes.
18 Q.   Personally?
19 A.   Along with an additional five-year
20   lease from the restaurants from a --
21 Q.   Okay.  Following September the 24th,
22   2004, did you receive any revenues
23   from the business?

Page 55

1  A.   Only in terms of percentages of
2    catering.
3  Q.   Okay.  And is it your position today
4    that you're entitled to revenues from
5    the business subsequent to September
6    the 24th, 2004, you or Simple
7    Pleasures, Incorporated?
8  A.   Well, Simple Pleasures is still owed
9    for all the equipment and all the --
10   what it gave at that particular time.
11   I mean, because it was used.
12 Q.   Okay.  But with respect to your claim
13   against the profits of the business,
14   is it your position in this lawsuit
15   that you're entitled to the revenues
16   from the -- stemming from the
17   operation of the business subsequent
18   to -- I mean after September the 24th,
19   2004?
20 A.   It's -- I'm in the opinion that Simple
21   Pleasures, Inc. owns that business and
22   everything in it, and whatever it was
23   doing and the profit from it more than

Page 56

1    V Restaurants has --
2  Q.   Okay.
3  A.   -- does, has title to it.  As far as
4    I'm concerned, it, V Restaurants,
5    never executed their part of the deal
6    where, yet, Simple Pleasures did.
7  Q.   And you've heard testimony earlier
8    about a landlord foreclosing liens?
9  A.   I understand.
10 Q.   Are you -- do you question that or are
11   you challenging that process here
12   today as far as your lawsuit?
13 A.   I am challenging that that process
14   happened because Vince said he was not
15   from V Restaurants, did not fulfill
16   his part of the agreement.
17 Q.   I'm looking at paragraph eight of
18   Exhibit No. 1, and it speaks of the
19   remaining 30,000.  I presume --
20 A.   Um-hmm.
21 Q.   -- that 30,000 -- 60,000 cash coming
22   in from Mr. Saele, 30,000 would go to
23   Region's; is that correct?

Page 57

1  A.   Correct.
2  Q.   And 30,000 would go to the Internal
3    Revenue Service?
4  A.   Correct.
5  Q.   For the release of all liens that they
6    may have against Phillip?
7  A.   Um-hmm.
8  Q.   That would be you; is that correct?
9  A.   Correct.
10 Q.   Individually or the business?
11 A.   Um-hmm.
12 Q.   Have you been successful today in
13   getting your individual tax -- any
14   lien that may be filed against you
15   individually released?
16 A.   No.
17 Q.   Okay.  Those tax liens remain; is that
18   correct?
19 A.   Correct.
20 Q.   Even today?
21 A.   Um-hmm.
22 Q.   You had a tax obligation of over
23   $30,000 to the Internal Revenue

15  (Pages 54 to 57)

PHILLIP   GOODWYN - 2/17/2006

Page 58

1    Service; is that correct?
2  A.   Correct.
3  Q.   Had you filed any type of Offer in
4    Compromise or directed your attorney
5    to file an Offer in Compromise with
6    the Internal Revenue Service?
7  A.   I believe we made an offer.
8  Q.   Okay.  And have you received a -- an
9    acceptance of that offer for you
10    personally, let me begin with.
11  A.   I believe that the direction that we
12    were taking at this time prior to them
13    not doing it is different than the
14    direction that we are in presently.
15  Q.   Let me ask you:  Did you file an Offer
16    in Compromise with the Internal
17    Revenue Service?  Did you or -- did
18    you instruct your attorneys to file an
19    Offer in Compromise with the Internal
20    Revenue Service?
21  A.   Yes, I instructed my attorney.
22  Q.   Are you aware -- had there been any
23    other efforts to compromise this

Page 59

1    liability other than through the
2    Offer-in-Compromise program?
3  A.   No.
4  Q.   Okay.  Are you sitting here today
5    suggesting that the liability, as
6    assessed, as indicated by the Internal
7    Revenue Service, is incorrect; that
8    you don't owe that much money?
9  A.   No, I wouldn't say.
10  Q.   In other words, you owed more than
11    $30,000?
12  A.   Correct.
13  Q.   And you have not attempted to reduce
14    that liability, or get that liability
15    reduced through any other means other
16    than the Offer in Compromise; is that
17    correct?
18  A.   Correct.
19  Q.   You haven't challenged the underlying
20    assessment, have you?
21  A.   No.
22  Q.   So consequently, there would have been
23    a balance even greater remaining

Page 60

1    unless the Internal Revenue Service
2    released the business and you?
3  A.   Correct.
4  Q.   And you're -- what's the progress on
5    your efforts to reduce that liability
6    today?  What has occurred?
7  A.   I've not made any arrangements at this
8    time.
9  Q.   Have you attempted anything?
10  A.   No.
11  Q.   Okay.  Did you read paragraph number
12    nine?
13  A.   Um-hmm.
14  Q.   Did you discern from that that maybe
15    some of the terms and conditions of
16    this letter are not -- are not
17    intended by the parties to be engraved
18    in stone or by any --
19  A.   The -- I guess with my naive behavior,
20    I felt like what we were discussing
21    here was the sale of the business, an
22    operating entity that was capable of
23    operating, and that's what I was

Page 61

1    giving him.
2  Q.   Had there -- prior to September the
3    24th, had there been discussions
4    between yourself and Mr. Saele and/or
5    your counsel, being Mr. Memory, I take
6    it; is that correct?
7  A.   Correct.
8  Q.   And Mr. Buster Russell about the sale
9    of this business?
10  A.   Yes.
11  Q.   Had there been correspondence between
12    the attorneys?
13  A.   Yes.
14  Q.   And discussions between the two of
15    you, Mr. Goodwyn and -- being Mr.
16    Goodwyn yourself and Mr. Saele?
17  A.   Yes.
18  Q.   Okay.  How long had that been going
19    on?
20  A.   Probably six weeks.
21  Q.   Okay.  And did you want this sale to
22    -- or this transfer to occur as
23    promptly as possible?

16 (Pages 58 to 61)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN - 2/17/2006

Page 62

1  A.  Yes.
2  Q.  Was it your opinion that Mr. Saele
3      wanted this transfer or sale to occur
4      as promptly as possible?
5  A.  Yes.
6  Q.  Do you doubt on September the 24th,
7      2004, that Vince Saele wanted to go
8      through with this transaction?
9  A.  No.
10 Q.  What would have changed his mind or do
11     you know of anything that would have
12     changed his mind?  What do you know
13     today?
14     MR. MEMORY:  Object to the
15     form.  You can't look in his mind and
16     answer that question.
17 Q.  (BY MR. HAMM)  Have you got any
18     information other than the letter from
19     Mr. Buster Russell that was presented
20     a few moments ago that was shown as
21     Exhibit 3 in the Vince Saele
22     deposition, anything other than this
23     document saying that Mr. Saele does

Page 63

1      not wish to go through with the
2      transaction?
3  A.  No.
4  Q.  Okay.  And do you know of anything
5      other than that indicating to you that
6      -- I asked you if you had anything
7      other than that document, item No. 3.
8      But do you know of anything else that
9      would have indicated to you that
10     Mr. Saele did not wish to go through
11     with this transaction?
12 A.  No.
13 Q.  Okay.  And Mr. Saele's failure to
14     follow through with this transaction
15     is the sole basis for your breach of
16     contract?
17 A.  Correct.
18 Q.  Okay.  With respect to conversion, you
19     have alleged a claim of conversion.
20     First, do you understand what we mean
21     or what is meant by the term
22     "conversion"?
23 A.  No.  What do you mean by conversion?

Page 64

1  Q.  Well, why don't you read paragraph
2      number 21 and 22 of the lawsuit
3      itself, the complaint itself -- I'm
4      sorry, paragraph 27 through 31.
5  A.  (Witness complies.)  Okay.
6  Q.  How did Mr. Saele take this business
7      from you?  Explain to me.
8  A.  He refused to pay for what he agreed
9      to pay for.
10 Q.  Did you give him the keys to the
11     location?
12 A.  Absolutely.
13 Q.  And did he commence the operation of
14     the business?
15 A.  Yes, he continued operations.
16 Q.  Are you suggesting that on September
17     the 24th he had a plan to somehow take
18     this business from you?
19 A.  I can't read into his mind.
20 Q.  Okay.  Have you got any evidence of
21     that, anything other than your
22     conclusions at this moment just before
23     that?

Page 65

1      MR. MEMORY:  Object to the
2      form.
3  Q.  (BY MR. HAMM)  Have you got anything
4      that would say to you or suggest to
5      you that Mr. Saele --
6  A.  Only by what happened and them pulling
7      the contract, by not mentioning
8      anything, not saying, "Hey, I need
9      to -- we need to get something in
10     writing on these things, otherwise I'm
11     going to pull -- I'm not going to pay
12     you."  There was no attempt to
13     reconcile any differences in any
14     problems.  Where I was proceeding as
15     though everything was fine -- because
16     it was.  He had full operations.  He
17     had everything he needed.  I was under
18     no idea that in any way, form, or
19     fashion he could have been hindrance
20     (sic), and he wasn't.  He had no --
21     nothing was taking his equipment.
22     Nothing was stopping him, so how was I
23     not delivering?  And so I was

17 (Pages 62 to 65)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 66

1    expecting him to do the same.
2    Q.   But -- so is it fair to say that by
3         Mr. Saele and V Restaurants,
4         Incorporated not following through
5         with the contract, that they have
6         converted your restaurant to their own
7         use?
8    A.   Correct.
9    Q.   Okay.  And that is the manner by which
10        they took this business from you?
11   A.   Their refusal to pay me made it --
12        made me not be able to make my
13        obligations to Spectrum, which was to
14        deliver the $30,000 contract
15        between --
16   Q.   Well, the contract was coming from
17        Mr. Saele, was it not?
18   A.   Right.  But I was delivering him in
19        full, and he was coming with the
20        money.  I had told him that Vince was
21        in agreement to sign this.  He was
22        paying me $60,000, which would deliver
23        then the equipment to Spectrum.

Page 67

1    Q.   Okay.
2    A.   Because Spectrum wanted the equipment
3         and everything released from liens,
4         also from Region's liens and from the
5         IRS.  So suddenly, because Vince pulls
6         out of that agreement, I can't fulfill
7         the portion for Spectrum.
8    Q.   So you're telling the Court and
9         testifying today that by virtue of Mr.
10        Saele not following through with his
11        obligations under this September 24th,
12        2004 contract, he converted your
13        business to his use?
14   A.   Well, he took it to his use, but we
15        signed this contract.
16   Q.   Okay.  And then failing to follow
17        through with this agreement of
18        September the 24th, right?
19   A.   I signed over the ABC license, signed
20        over the power, signed over everything
21        immediately once this was done.
22   Q.   Um-hmm.  I'm just trying to understand
23        the basis of your claim.

Page 68

1    A.   Right.
2    Q.   Is that -- his failure to follow
3         through with the agreement on
4         September 24 --
5              MR. MEMORY:  No, no.  He's
6         answered that twice as to what -- I
7         know what you want to get at him, but
8         --
9              MR. HAMM:  No.  Tell me.
10             MR. MEMORY:  Exactly.  That
11        it's not the basis just to the
12        contract, that there's more to it than
13        that.
14   Q.   (BY MR. HAMM)  Well, if there is,
15        please tell me.  That's what I'm
16        asking.
17             MR. MEMORY:  Answer his
18        question.
19   Q.   (BY MR. HAMM)  Is there anything more
20        than the contract, the underlying
21        contract, that you say Mr. Saele
22        breached to support your conversion
23        plan?  Let me ask it this way --

Page 69

1    unless you wish to answer that
2    question.
3    A.   I'm thoroughly --
4    Q.   Had Mr. Saele followed through with
5         the contract?
6    A.   Um-hmm.
7    Q.   Would you have a conversion claim
8         against Mr. Saele had he done what
9         y'all had agreed on September the
10        24th, 2004?
11   A.   If he had of done -- if he had
12        performed -- transferred money and
13        signed the lease with Spectrum
14        Development, there would be no claim
15        against Vince Saele.
16   Q.   No claim for conversion or no claim at
17        all?
18   A.   I believe there would be no -- that we
19        would have no contentions.
20   Q.   Okay.  With respect to unjust
21        enrichment, what supports that claim?
22   A.   That he took over a business without
23        the intentions of paying or without

18  (Pages 66 to 69)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN - 2/17/2006

Page 70

1 paying, and I don't know what his
2 intentions are or not, without paying.
3 Q.  Okay.  Do you have any evidence or any
4    suggestion today that on September the
5    24th Vince Saele did not intend to
6    purchase this business?
7 A.  Except that he had entered into or
8    quickly entered into a deal with Ed
9    Fatzinger to do it.  I don't know.
10 Q.  So it had -- might be supported by the
11    timing of his agreement with
12    Mr. Fatzinger also?
13 A.  I know that they'd had numerous
14    negotiations and discussions, and I
15    don't know what might have been going
16    on.  I can't -- I don't know.
17 Q.  Well, let's talk about that.  What is
18    your understanding of his agreement
19    with Mr. Fatzinger?
20 A.  My understanding was -- is that he was
21    going to sign an additional lease, and
22    which is part of what we had
23    discussed, and a $30,000 note.

Page 71

1 Q.  Well, that was part of your agreement?
2 A.  Right.  That was my understanding that
3    Vince had with Ed.
4 Q.  Sitting here today, you know that Mr.
5    Saele is operating a restaurant in the
6    Gator's location on Vaughn Road?
7 A.  Right.  Right.
8 Q.  How did that come to be, or what is
9    your understanding of how that came to
10    be?
11 A.  Because I handed him the keys and the
12    reputation and the equipment.
13 Q.  Did something occur between -- well,
14    since between September --
15 A.  And I signed over the license and I
16    signed over everything and I gave him
17    the phone.  I did all of this.
18 Q.  But you know Spectrum Development
19    continues to own that facility out
20    there; is that correct?
21 A.  Correct.  Ed was forced into
22    exercising a lien, if that's what
23    you're getting to, in order to clear

Page 72

1 up title when Vince had failed,
2 decided he was not going to -- to move
3 forward on this.
4 Q.  Do you have any indication of when
5    that may have happened?  Did you
6    receive notice of that?
7 A.  We received notice of the lien
8    intention, which I then spoke to Ed
9    about, and he said it was a formality,
10    to continue to move forward, so that
11    it was only a formality, but he wanted
12    to fulfill this contract that he was
13    aware of because he wanted clean, you
14    know -- this is what he wanted
15    (indicating).
16 Q.  Do you recall when you received the
17    notice from Mr. Fatzinger?
18 A.  Early -- no.  I received --
19 Q.  Let me ask you this:  Was it after --
20    before September the 24th --
21 A.  We had no notice prior to this, and
22    that's when Ed and I were discussing
23    that we're, Vince and I, were working

Page 73

1 on this to move forward.
2 Q.  Okay.  Was there a notice subsequent
3    from Mr. Fatzinger, subsequent to the
4    September the 24th, 2004?
5    MR. YARBROUGH:  I object to
6    the form and let me tell you the basis
7    of my objection.  You're not
8    specifying notice of point, and --
9 Q.  (BY MR. HAMM)  Well, did you receive
10    any correspondence from Mr. Fatzinger
11    subsequent --
12 A.  I believe we did.
13 Q.  What do you recall that correspondence
14    being subsequent to September the
15    24th, 2004?
16 A.  I'm not sure because we deal with each
17    other, Ed and I, separately.  I don't
18    know.  I mean, I just know that he was
19    telling me we need to get something
20    resolved here.  We need to get this
21    thing moving.
22 Q.  So following September the 24th, 2004,
23    Mr. Fatzinger was suggesting to you to

19 (Pages 70 to 73)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 74

1  get this transaction resolved?
2  A.   Even prior to September 24th.  He was
3      putting pressure on Region's.  He
4      wanted to put pressure on Region's and
5      the IRS and everybody to let's get
6      this thing done and settle up.  So he
7      was taking action to help me
8      facilitate getting everybody on the
9      same page.  That was Ed's idea of a
10     way to make it all happen faster, not
11     in turn to steal the restaurant or
12     force me out, but to make it happen.
13 Q.   Are you suggesting that Mr. Fatzinger
14     --
15 A.   Um-hmm.
16 Q.   -- or Spectrum Development and
17     Mr. Saele, acting for V Restaurants,
18     they got together in some way to cheat
19     you out of your restaurant and this --
20 A.   No.  No.  I'm saying that Spectrum
21     Development -- Spectrum Development
22     initiated a letter prior to this to
23     help me make sure that Region's was

Page 75

1      going to be in full agreement and the
2      IRS of the $30,000 offer being offered
3      by Vince Saele and V Restaurants.  So
4      he was issuing a lien but not with any
5      intentions of actually forcing it, but
6      to clean this -- to make things go
7      forward, to help perpetuate.
8  Q.   You're not suggesting that Mr. Saele
9      and V Restaurants and Spectrum and
10     Mr. Fatzinger got together in some way
11     to deprive you of your restaurant, are
12     you?
13 A.   You know, I can't -- in retrospect, I
14     can't say that's not the case.  All I
15     can say is, for a fact, is that Ed at
16     that time, Ed Fatzinger, expressed to
17     me that he was initiating this letter
18     in order to help me facilitate and get
19     everybody on the same page to get this
20     deal done.
21 Q.   Okay.  You're saying in retrospect you
22     cannot say that that was not the case?
23 A.   Right.  All I know is at that time Ed

Page 76

1      told me I'm initiating a lien, this
2      notice of foreclosure, in order to
3      force everybody else to see the
4      urgency to get this deal done but with
5      no intentions of taking any actions on
6      anything.
7  Q.   When did that occur?  When were you
8      informed of that?
9  A.   Well, Ed and I were in discussion.  I
10     was trying to get this deal done
11     mid-September and early September,
12     that we were trying to get the deal
13     done, and we were waiting for Region's
14     to give us the paperwork, and he said,
15     well, I can help force that half, and
16     that's what was happening.
17 Q.   So he issued some notice that he was
18     going to foreclose his lien?
19 A.   He issued some -- beginning of
20     foreclosure proceedings.
21 Q.   Did that ever occur that you know of?
22 A.   That the foreclosure occurred?
23 Q.   That there was a foreclosure of the

Page 77

1      landlord's lien --
2  A.   Yes.
3  Q.   -- on the furniture and, I guess,
4      everything --
5  A.   Right.
6  Q.   -- that Simple Pleasures owned inside
7      of the restaurant?
8  A.   Right.  After Vince had said he was no
9      intentions of paying.
10 Q.   Okay.  So it occurred following
11     Mr. Saele's -- the letter from
12     Mr. Russell --
13 A.   Correct.  Correct.
14 Q.   -- that is Exhibit No. 3 --
15 A.   Correct.
16 Q.   -- of Mr. Saele's deposition?
17 A.   Right.
18 Q.   Okay.  Following that, the landlord
19     foreclosed their lien?
20 A.   Correct.
21 Q.   Are you aware today of any defects in
22     that process, that it should not have
23     happened, or they didn't do some

20  (Pages 74 to 77)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP GOODWYN - 2/17/2006

Page 78

1    noticing procedures, or the legal
2    process was wrong?
3  A.   You know, I don't think -- I don't
4    know.  I don't know.
5  Q.   Are you aware of any facts, anything
6    that might give you reason to
7    challenge that?
8  A.   Well --
9  Q.   Other than you not liking the outcome?
10        MR. MEMORY:  I object to the
11    form.
12  A.   There was no effort to really make an
13    active true sale -- I mean, no real
14    postings, no real -- I mean, if you
15    want to sell something to get a real
16    profit for it, you know, get as much
17    money as you could, I don't think that
18    was actively done, no.
19  Q.   (BY MR. HAMM)  Okay.  Other than the
20    failure to solicit all offers or
21    whatever --
22  A.   Right.
23  Q.   -- to properly advertise --

Page 79

1  A.   Where it was quietly coming to the
2    conclusion that we're trying to do
3    this amount of money, yes, that's
4    probably what was happening at that
5    particular time because it was
6    operating and Spectrum had wanted
7    Vince to continue, or V Restaurants,
8    to continue operating, wanted an
9    operating entity, not someone to come
10    pull the equipment out.
11  Q.   What facts do you know today to
12    support your claim that V Restaurants,
13    or Mr. Saele, defrauded you in some
14    manner?
15  A.   The facts are -- is that I delivered
16    the full intentions of what I was
17    delivering, what was being requested.
18    I gave him full access, gave him keys,
19    gave him everything.  He had no
20    hindrances to owning and operating
21    that business.
22  Q.   Okay.
23  A.   And he submits a letter and says I'm

Page 80

1    not going to do it and says we're not
2    going to execute.  I'm not going to
3    pay you for this.
4  Q.   Is it fair to say that the facts are
5    his failure to go through with this
6    contract of September the 24th, 2004,
7    that's what -- those are the facts
8    that support your fraud claim?
9  A.   Is his failure to execute this deal.
10  Q.   Did he tell you anything that was
11    misleading?  Can you tell me any --
12    anything he told you about the
13    September 24, 2004 contract that was
14    untrue, that you know today to be
15    untrue?
16  A.   I don't think -- I mean, do I know any
17    facts?  Would you restate that
18    question?  Do I know of any facts that
19    he said that were untrue?
20  Q.   Right.  On or about September -- any
21    representations he made to you about
22    this September 24 contract to get you
23    to sign or that you know today to be

Page 81

1    untrue, to get you to sign this
2    document?
3  A.   Well, I know today that he then chose
4    not to fulfill the contract, even
5    though there was no -- that time was
6    not the issue.  He had full access.
7    That was not an issue, and that was,
8    you know -- so there was no reason for
9    him to withdraw the contract.  The
10    contract was still in place as far as
11    -- or an agreement between the two of
12    us was still in full agreement,
13    enforcement.
14  Q.   Let me ask you this way:  Other than
15    Mr. Saele and V Restaurants' failure
16    to follow through with the contract of
17    September the 24th, are there any
18    other facts that support your fraud
19    claim?
20  A.   Did he try to then buy the equipment
21    at the low price to get it in and to
22    do it in a subversive manner?  Yes, I
23    think that is exactly what he was

21  (Pages 78 to 81)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN - 2/17/2006

Page 82

1  trying to do.
2  Q.  Okay.  You think on September the
3     24th, 2004 he was attempting to do
4     that?
5  A.  No.
6  Q.  Okay.  When did that -- when did you
7     --
8  A.  I don't know.
9  Q.  When did that occur?
10  A.  I should say I don't know that that
11     wasn't his mindset, attempting --
12  Q.  Okay.
13  A.  I did not think it was or I wouldn't
14     have signed it.
15  Q.  You're sitting here today telling us
16     that Mr. Saele bought this restaurant
17     equipment at a below-market price; is
18     that correct?
19  A.  Correct.
20  Q.  And that fact supports your contention
21     that you were defrauded in some manner
22     or helps aid in supporting your
23     contention you were defrauded in some

Page 83

1  manner; is that correct?
2  A.  Correct.
3  Q.  Okay.  But other than that fact, is
4     there anything that you know other
5     than the fact that Mr. Saele purchased
6     this restaurant at, you say, a
7     below-market price, there's no other
8     facts that you know that support the
9     fact -- support the notion that you
10     were defrauded in some manner?
11  A.  I just keep getting to the fact that
12     he withdrew the contract that was
13     going to be paid --
14  Q.  Right.
15  A.  -- and then everything would have been
16     fine.
17  Q.  Withdrew the contract and purchased it
18     below market, correct?
19  A.  Right.  Because I had no use for it at
20     that point.
21  Q.  Okay.  You've also alleged that --
22     MR. HAMM:  Mr. Memory, I know
23     you've got to get out of here.

Page 84

1     MR. MEMORY:  What time is it?
2     MR. HAMM:  11:15 by my watch,
3  but it's unreliable.
4     MR. MEMORY:  What time have
5  you got, Coleman?
6     MR. YARBROUGH:  I have 11:15.
7     MR. MEMORY:  I've got 30
8  minutes to get to Tuskegee for a
9  twelve noon meeting.
10  Q.  (BY MR. HAMM)  With respect to the
11     conspiracy count, do you understand
12     generally what conspiracy is?
13  A.  Um-hmm, yes.
14  Q.  Tell me what you understand a
15     conspiracy to be.
16  A.  Collusion.
17  Q.  An agreement --
18  A.  An agreement --
19  Q.  -- between people to do something
20     wrong?
21  A.  To do something to -- that harms
22     another party.
23  Q.  Okay.  Between who in your case?

Page 85

1  A.  In my case it would have been between
2     Spectrum Development and --
3     MR. HAMM:  I'm going to stand
4  up for a second.
5  A.  -- and Vince Saele or Ed Fatzinger and
6     Vince Saele.
7  Q.  (BY MR. HAMM)  Spectrum Development
8     and --
9  A.  -- or Ed Fatzinger and Vince Saele.
10  Q.  The four parties to this litigation:
11     Fatzinger -- well, he's not a party to
12     this litigation.  Spectrum
13     Development, Vince Saele, and V
14     Restaurants?
15  A.  Correct.
16  Q.  They got together in some manner to do
17     you some harm?
18  A.  It is possible.
19  Q.  Oh, okay.  Do you know it to be a fact
20     or agreed in some manner to do you
21     some harm?
22  A.  I do know that they came to an
23     agreement on how to execute and how to

22  (Pages 82 to 85)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP  GOODWYN - 2/17/2006

Page 86

1    end up with the restaurant and its --
2    and everything.
3    Q.  Do you know when they came to this
4    agreement?
5    A.  No.
6    Q.  How did you learn of the agreement?
7    A.  Well, I guess technically I don't know
8    of a specific agreement, I guess, in
9    retrospect of --
10   Q.  Okay.  How do you know there was an
11   agreement then?  Maybe I should ask it
12   that way.
13   A.  I would assume that they had come to
14   some level and it was being an
15   assumption I would have made.
16   Q.  Okay.  And how do you draw that
17   conclusion that there was an
18   agreement?
19   A.  The fact of him pulling, refusing to
20   pay and figuring out a way to -- he
21   had to have gotten clear title from
22   Spectrum because Spectrum was the one
23   that was going to end up owning

Page 87

1    everything.
2    Q.  Do you think that agreement occurred
3    before September the 24th, 2004?
4    A.  I would not have been aware.  I don't
5    know.
6    Q.  Okay.  Do you think it may have
7    occurred -- have you got anything to
8    indicate that if occurred after
9    September the 24th, 2004?
10   A.  It would have been more -- or likely
11   after.
12   Q.  Do you think it would have been before
13   or after the Saele Exhibit Number 3,
14   the Exhibit Number 3 to his
15   deposition, which is dated November
16   the 30th, 2004?
17        MR. HAMM:  Then that's the
18   letter filed Exhibit Number 3, the
19   letter from Mr. Russell.  I'll make a
20   copy of this and hand it to Mr.
21   Goodwyn's deposition.
22   Q.  (BY MR. HAMM) But do you think it
23   would have been -- that agreement

Page 88

1    would have been before or after that
2    date?
3    A.  I would assume that he would be
4    looking at it in November 30 -- prior
5    to the November 30th date.
6    Q.  You think they made some agreement
7    prior to November 30th, 2004 to --
8    A.  I can't say that they -- honestly
9    can't say that they, in my mind, made
10   it or rather Vince had figured out a
11   way to try to -- to come -- whether
12   Vince had figured out a way, by having
13   discussions with Ed Fatzinger, on
14   ascertaining the business in a
15   different form.
16   Q.  So you think that Mr. Saele may have
17   just kind of conjured up a plan?
18   A.  Right.  From discussions with Ed
19   Fatzinger.
20   Q.  And would that conjuring up of plans
21   be to not go through with the contract
22   with you, which --
23   A.  Right.

Page 89

1    Q.  -- was on September the 24th --
2    A.  Correct.
3    Q.  -- and then wait for Spectrum
4    Development to foreclose their lien?
5    A.  Correct.
6    Q.  Okay.  Other than that happening, the
7    events happening in that manner; that
8    is, the contract did not go through,
9    and, yes, in fact, Spectrum
10   Development did foreclose their lien
11   on the furniture and fixtures in this
12   restaurant, and thereby have rights to
13   that property, other than those two
14   things occurring, what other facts do
15   you know today that support a
16   conspiracy count?
17   A.  None.
18        MR. HAMM:  Von, you want to --
19   let's just adjourn this deposition.
20        MR. MEMORY:  That's fine.
21        MR. HAMM:  I think that might
22   be best because I've got some more,
23   and you've got to get to Tuskegee.

23  (Pages 86 to 89)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

PHILLIP   GOODWYN - 2/17/2006

Page 90

1   (Whereupon, the deposition of PHILLIP
2   GOODWYN was adjourned at approximately
3   11:29 a.m., on February 17, 2006.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 92

1   the foregoing 90 typewritten pages
2   contain a true and accurate
3   transcription of the examination of
4   said witness by counsel for the
5   parties set out herein; that the
6   reading and signing of said deposition
7   was waived by witness and counsel for
8   the parties.
9       I further certify that I am
10   neither of kin nor of counsel to the
11   parties to said cause, nor in any
12   manner interested in the results
13   thereof.
14       This 27th day of February, 2006.
15
16
17       Aimee French,
         Reporter and Notary Public
18       State of Alabama at Large
19
20
21
22
23

Page 91

1       * * * * * * * * * * * *
2       REPORTER'S  CERTIFICATE
3       * * * * * * * * * * * *
4
5   STATE OF ALABAMA
6   COUNTY OF MONTGOMERY
7
8       I, Aimee French, Certified
9   Shorthand Reporter and Notary Public
10   in and for the State of Alabama at
11   Large, do hereby certify that on
12   February 17, 2006, pursuant to notice
13   and stipulation on behalf of the
14   Defendant, I reported the deposition
15   of PHILLIP GOODWYN, who was first duly
16   sworn by me to speak the truth, the
17   whole truth, and nothing but the
18   truth, in the matter of SIMPLE
19   PLEASURES, INC., Plaintiff, versus V
20   RESTAURANTS, INC., ET AL, Defendants,
21   Case Number 05-32325-WRS, now pending
22   in the United States Bankruptcy Court
23   for Montgomery County, Alabama; that

24  (Pages 90 to 92)

b4ce0427-0b12-4d29-a34d-e5e61109eba8

# PARNELL & CRUM, P.A.
### ATTORNEYS AT LAW
#### 641 SOUTH LAWRENCE STREET
#### MONTGOMERY, AL 36104

CHARLES N. PARNELL, III
G. BARTON CRUM
ROBERT J. RUSSELL, JR.
BRITT BATSON GRIGGS
MATTHEW T. ELLIS
ADRIAN D. JOHNSON
J. MATTHEW PARNELL
DAYNA R. BURNETT

TELEPHONE
334-832-4200

TELECOPIER
334-293-3551

MAILING ADDRESS
P.O. BOX 2189
ZIP CODE 36102-2189

September 24, 2004

<u>**VIA FACSIMILE - 834-8001**</u>

Von G. Memory
Attorney at Law
469 S. McDonough Street
Montgomery, Alabama 36104

Dear Von:

I am in receipt of your sales agreement and have briefly reviewed same, deciding that it is not possible to make the corrections and amendments this afternoon prior to 5:00. Thus, I write this letter as a memorandum of agreement, which I believe contains the pertinent provisions, until we can get the final draft documentation agreed upon. They are as follows:

1. That the purchase price shall be $90,000.00;

2. That the purchase price is for all of the assets, including, but not limited to, licenses and leases, equipment, office supplies, inventory, automobiles/delivery van, etc., and any other of the same located off-premises in storage buildings, etc.;

3. That Seller will lease the business to Buyer, along with all licenses and property until the date of closing for the sum of $250.00;

4. That the ownership of the properties mentioned herein above will be transferred to my client at a closing date no later than October 22, 2004, or as otherwise agreed upon by the parties, and that the property transferred shall be transferred without any liens or encumbrances whatsoever;

5. That the closing is contingent upon Regions accepting the sum of $30,000.00 for Phillips' lien.

6. That Spectrum Development will accept a note from Vince in the amount of $30,000.00 and that the $30,000.00 note shall be counted as consideration towards the purchase of the business;

Von G. Memory
September 24, 2004
Page Two

7.     That Buyer is entitled to all revenues derived from the business from the date of the
       consummation of this agreement forward;

8.     That the remaining $30,000.00 be paid to the Internal Revenue Service for and in
       consideration of the release of any and all liens which they may have against Phillip,
       individually, or the business  (if any additional monies are owed, Phillip pays);

9.     In the event that any of the contingencies stated herein are not complied with or
       fulfilled by the Obligor, consideration shall be immediately withdrawn from the Trust
       Account and returned to the Purchaser;

10.    That upon the consummation of this document, the Purchaser shall be entitled to
       utilize the premises and operate the business in its normal manner and without
       interference from Mr. Goodwyn;

11.    That the catering business operating out of Gator's shall continue, but only be
       operated by its new owner;

12.    That if any of the contingencies fail wherein the Seller is the Obligor, Seller shall
       reimburse Purchaser for any and all net financial losses or expenses related thereto.

Von, my client is at wits end and feels he may be wasting his time.  These terms are non-
negotiable and this must be signed by tomorrow at noon (Saturday, September 25, 2004).

                                                        Sincerely,

                                                        Robert J. Russell, Jr.

RJRjr/fd

V Restaurants, Inc.                         Simple Pleasures, Inc.
By:  Vince Saele                            By:  Phillip Goodwyn
Its:  President                             Its:  President

# IN THE UNITED STATES
# BANKRUPTCY COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

|  |  |
|---|---|
| **IN RE:**<br>**PHILLIP GOODWYN,**<br>**DEBTOR,** | **CHAPTER 7**<br>**CASE NO. 05-32325-WRS** |
| **SIMPLE PLEASURES, INC.,**<br>**PLAINTIFF,** | **ADVERSARY PROCEEDING**<br>**NO. 05-03062** |
| **V.** |  |
| **V. RESTAURANTS, INC.,**<br>**DEFENDANT.** |  |

## AFFIDAVIT OF
## ROBERT J. RUSSELL, JR.

My name is Robert J. Russell, Jr. and I am over 19 years of age and competent to testify to the following:

1. I am a licensed practicing attorney in Montgomery, Alabama and have been so since 1986. I currently practice in the law firm of Parnell & Crum, P.A. in Montgomery, Alabama. I am a member of the Alabama State Bar and in good standing.

2. During the year 2004, Vince Saele, acting on behalf of V Restaurants, Inc. (hereinafter V Restaurants) retained me to represent V Restaurants with its upcoming acquisition of a restaurant known as Gators Restaurant located in the Vaughn Plaza Shopping Center in Montgomery Alabama. Mr. Saele was the owner of V Restaurants. At the time I was employed, Gators Restaurant was owned by Simple Pleasures, Inc. Simple Pleasures was owned by its President, Mr. Phillip Goodwyn.

3. During the summer of 2004, again acting on behalf of V Restaurants, I began negotiations with Mr. Von Memory, Esq. who at the time represented Mr. Goodwyn and Simple Pleasures, Inc. The purpose of this negotiation was to reach an agreement between Simple Pleasures, Inc. and V Restaurants, Inc. for the acquisition of the Gators Restaurant location.

4. Over the course of that summer there were several proposals tendered by Mr. Memory acting on behalf of Simple Pleasures, Inc. I responded to these proposals after consultation with Mr. Saele.

5. The negotiations for the acquisition of the Gators Restaurant location was made more difficult because of outstanding Federal tax liens and a secured interest owned by Regions Bank. These liens attached to the furniture and fixtures housed within the restaurant location. In addition to these encumbrances upon the property, Mr. Goodwyn had allowed the monthly rental payments to go unpaid for a number of months, creating a rental obligation to the owner of the restaurant location, Spectrum Development, Inc.

6. Negotiations continued for several weeks and Mr. Saele instructed me to respond to one of Mr. Memory's latter proposals with a letter dated September 24, 2004. This letter detailed the terms and conditions upon which Mr. Saele and V Restaurants, Inc. would take title to the restaurant location. A copy of this letter is made a part of this affidavit. The letter was signed by Mr. Saele and Mr. Goodwyn, both acting on behalf of corporations involved in the transaction.

7. Mr. Saele was at that time operating the restaurant and wanted the sale/purchase to take place or he would then be forced to take alternative routes. This

letter/agreement set out the terms and conditions upon which Mr. Saele was willing to proceed with the acquisition of the Gator's restaurant location. This letter/agreement contained the terms important to Mr. Saele regarding the restaurant acquisition.

8. Paragraph #4 of the September 24, 2004 letter required Mr. Goodwyn to transfer the Gators Restaurant to V Restaurants, Inc. free of the Federal tax liens and the Region Bank interest. This transfer was to occur on or before October 22, 2004, and should the liens not be cleared and the transfer occur, then the agreement would become void and Mr. Saele and V Restaurants would be released from the agreement.

9. Between the writing of the letter on September 24, 2004 and the agreed date upon which the transfer was to take place, October 22, 2004, I made a number of phone calls to Mr. Memory's office to determine the progress of efforts on behalf of Mr. Goodwyn to clear the liens and encumbrances in question. Through-out all of theses calls, when I did receive a return phone call, I was never provided any assurance that the subject liens and encumbrances (Federal Tax lien and Regions lien) were being addressed by Mr. Goodwyn.

10. In spite of my additional efforts, I received no confirmation of sale from either Mr. Goodwyn or Mr. Memory.

**RESPECTFULLY SUBMITTED** this the 14th day of March, 2006.

ROBERT J. RUSSELL, JR.

**STATE OF ALABAMA**

**MONTGOMERY COUNTY**

I, the undersigned authority, a Notary Public for the State at Large, hereby certify that Robert J. Russell, Jr., whose name is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day, that being informed of the contents of the conveyance, he executed the same voluntarily on the day the same bears date.

**GIVEN** under my hand and official seal the 14th day of March, 2006.

Vivian P. Smith

NOTARY PUBLIC
MY COMMISSION EXPIRES: 10-21-07

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**PHILLIP GOODWYN,**<br>**DEBTOR,**<br><br>**SIMPLE PLEASURES, INC.,**<br>**PLAINTIFF,**<br><br>**V.**<br><br>**V. RESTAURANTS, INC., AND**<br>**VINCE SAELE,**<br>**DEFENDANTS.** | **CHAPTER 7**<br>**CASE NO. 05-32325-WRS**<br><br>**ADVERSARY PROCEEDING**<br>**NO. 05-03062** |

## DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN RESPONSE TO SUMMARY JUDGMENT

**COMES NOW** V Restaurants, Inc. and Vince Saele, Defendants in the above styled action, by and through their attorney of record, and replies to the Plaintiff's *Brief in Response to Motion for Summary Judgment of Defendant's*.

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ 2

Points and Authorities ......................................................................................................... 3

Factual Basis ....................................................................................................................... 4

Argument ............................................................................................................................. 5

    Breach of Contract ........................................................................................................ 7

        Date Certain – Time of the Essence ...................................................................... 7

        Substantial Performance ........................................................................................ 8

        Waiver ................................................................................................................... 9

    Conversion ..................................................................................................................... 9

    Unjust Enrichment ....................................................................................................... 10

    Fraud ............................................................................................................................ 10

Conclusion ........................................................................................................................ 11

# POINTS AND AUTHORITIES

**Cases**

Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir.1997)..................................... 6

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91
 L.Ed.2d 202 (1986) ........................................................................... 6

Anderson v. Smith's Towing Co., Inc., 867 So.2d 1121,
 (Ala.Civ.App.,2002) ........................................................................ 9

Barry Mogul & Assocs., Inc. v. Terrestris Dev. Co., 267 Ill.App.3d 742,
 643 N.E.2d 245, 205 Ill. Dec. 294, (1994) .................................... 10

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d
 265 (1986)........................................................................................ 6

Ellis v. Alcuri, 710 So.2d 1266, 1267 (Ala.Civ.App.1997)......................... 9

Fitzpatrick v. Atlanta, 2 F.3d 1112, 1116 (11th Cir.1993) ......................... 6

Gadsden Brick Co. v. Cranford, 273 Ala. 37, 134 So.2d 421, (Ala. 1961) ...... 9

Huntsville Golf Dev., Inc. v. Ratcliff, Inc., 646 So.2d 1334, 1336
 (Ala.1994) ........................................................................................ 9

Isom v. Johnson, 205 Ala. 157, 158, 87 So. 543 (1921)........................... 7

Kennedy v. Polar-BEK & Baker Wildwood Partnership, 682 So.2d 443,
 (Ala.1996) ...................................................................................... 10

Moore v. Lovelace, 413 So.2d 1100 (Ala.1982)....................................... 7

Rogers v. Relyea, 184 Mont. 1, 601 P.2d 37 (1979).................................. 7

Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala.1979)...................... 7

Sullivan v. Mazak Corp., 805 So.2d 674, (Ala.,2000)............................... 10

Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir.1992) ........... 6

United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38
 (11th Cir.1991)............................................................................. 6, 7

Wilson v. Williams, 257 Ala. 445, 59 So.2d 616, (Ala. 1963)..................... 8

## FACTUAL BASIS

Simple Pleasures, Inc. has for several years operated the restaurant known as Gator. The restaurant operates from the Vaughan Plaza Shopping Center in Montgomery, Alabama. Phillip Goodwyn is the sole shareholder of Simple Pleasures and was, up until September 2004, the operator of the Gators.

For several months prior to Mr. Goodwyn leaving the restaurant location, Gator had suffered financial problems. These financial problems resulted in substantial unpaid rent owed to Defendant Spectrum/Vaughn Plaza L.L.C. In addition to the rental obligation, unpaid Federal employee withholding taxes resulted in substantial Federal tax liens filed by the Internal Revenue Service. The restaurant was also in default on an obligation to Regions Bank who held a secured interest in the restaurant equipment.

During the Summer of 2004, Mr. Vince Saele acting as a consultant employed by Simple Pleasures began working at the Gators restaurant. Mr. Saele's efforts were to evaluate the restaurant and determine if it could become profitable. Mr. Goodwyn and Mr. Saele always anticipated that Mr. Saele may wish to enter an agreement with Mr. Goodwyn and Simple Pleasures and Spectrum/Vaughn Plaza L.L.C. to purchase the restaurant. Should the restaurant purchase come to pass, Mr. Saele would make the purchase through his corporation know as V Restaurants, Inc. Any agreement would address the unpaid rental obligation, the Federal tax liens and a secured interest that Regions Bank held in the restaurant equipment.

On September 24, 2004, after several weeks of negotiations between Mr. Goodwyn counsel and Mr. Saele counsel, Mr. Goodwyn and Mr. Saele, acting on behalf or their respective corporations, entered a letter of understanding at to the essential terms

of the restaurant sale/purchase. This letter is now a part of the file in this case and is attached as an exhibit to the Complaint.

A necessary condition of the letter of understanding dated September 24, 2004, between the seller and purchaser was that the transfer would occur "without any lien or encumbrances whatsoever." In addition, the transfer was to occur "at a closing date no later than October 22, 2004" and should any of the contingencies not occur "consideration shall be withdrawn from the Trust Account and returned to the Purchaser."

The Federal tax liens and the Regions secured interest were not cleared by October 22, 2004 and the property could not transfer without the attached liens as required in the letter of understanding. Mr. Saele and V Restaurants, Inc. elected to forgo the purchase of the restaurant from the Simple Pleasures, Inc.

Now Simple Pleasures, Inc. and Phillip Goodwyn sue V Restaurants, Inc, Spectrum/Vaughan Plaza, L.L.C. and Vince Saele for breach of contract, conversion, unjust enrichment, damages for use, fraud, negligence, wantonness, willfulness and conspiracy. The Defendant V Restaurants, Inc, and Vince Saele now move for summary judgment alleging that there is no genuine issue as to any material fact.

## ARGUMENT

*Bankruptcy Rules of Procedure 7056* and *Federal Rule of Civil Procedure 56(c)* provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." An issue of fact is "material" if, under the applicable

substantive law, it might affect the outcome of the case. *Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir.1997)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*; *Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir.1992)*). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson, 477 U.S. at 251, 252, 106 S.Ct. 2505*.

The moving party bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this "initial responsibility" by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir.1991)*. To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. Atlanta, 2 F.3d 1112, 1116 (11th Cir.1993)*.

On summary judgment, "the evidence of the non-movant is to be believed." *Anderson, 477 U.S. at 255, 106 S.Ct. 2505*. "The district court should resolve all

reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences ... in his favor." *Four Parcels, 941 F.2d at 1428*.

## *Breach of Contract*

This contract was breached; however, the breach was by Simple Pleasures, Inc and not by the Defendants. When a contracting party breaches its contract in a material manner the opposing party's right of action is complete upon the breach. *Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala.1979)*. A material breach is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract. *Rogers v. Relyea, 184 Mont. 1, 601 P.2d 37 (1979)*.

Simple Pleasures agreed to transfer the restaurant equipment without the Federal tax liens and the Regions secured interest and agreed to accomplish this by October 22, 2004. (See Complaint and letter of understanding attached) Mr. Goodwyn testified that the liens were not resolved on the required date. (Goodwyn Deposition page 50) The Regions liens were not released to allow a transfer of good title.

Date Certain – Time of the Essence

The Plaintiff now contends that the date stated in the contract, October 22, 2004, itself did not make time of the essence in this contract. This argument is without merit. It is a general rule in equity that time is not of the essence of a contract. However, the parties to a contract may make time of its essence by a clear manifestation of their intent to do so in the terms of their agreement. *Moore v. Lovelace, 413 So.2d 1100 (Ala.1982)*; *Isom v. Johnson, 205 Ala. 157, 158, 87 So. 543 (1921)*.

In this case, the agreement between the parties required the restaurant to "… be transferred no latter than October 22, 2004, or as otherwise agreed upon by the

parties…". The Plaintiff has produced no evidence of any subsequent agreement to transfer the restaurant after the October 22, 2004, date. In addition the agreement stated further "That in the event any of the contingencies stated herein are not fulfilled by the Obligor, consideration shall be immediately withdrawn from the Trust Account and returned to the Purchaser." More importantly the agreement states "Von, my client is at his wits end and feels he may be wasting his time. These terms are non-negotiable and this must be signed by tomorrow at noon (Saturday, September 25, 2004)."

The agreement clearly indicated the intent that time was of the essence in the agreement. The evidence of the parties' intent is strong enough to warrant this Court finding this issue as a matter of law. A date certain was placed in the contract, the agreement provided provisions as to events that would occur if that date certain were not met, and the agreement stated that the Purchaser (the V Restaurants and Saele) were not open to any further delays.

Substantial Performance

Where a contract is substantially performed by one party and the benefits thereof retained by the other, recovery may be had in an action of this kind on an averment of full or complete performance, although the proof shows only a substantial performance. Substantial performance does not contemplate a full or exact performance of every slight or unimportant detail, but performance of all important parts. *Wilson v. Williams, 257 Ala. 445, 59 So.2d 616, (Ala. 1963)*.

In this case, Goodwyn did not substantially perform his duties under the agreement. Although V Restaurants was placed in possession of the restaurant, Goodwyn was never, and still cannot today, deliver good title to the restaurant. The inability to

deliver good and marketable title to the subject of the contract will operate to deny recovery for substantial performance. *Gadsden Brick Co. v. Cranford, 273 Ala. 37, 134 So.2d 421, (Ala. 1961).*

<u>Waiver</u>

The Plaintiff argues that V Restaurants and Saele waived the right to have Goodwyn perform the terms of this agreement in a timely manner by failing to include a provision for strict compliance in the letter agreement. The Defendant reiterates the arguments contained under the heading *Date Certain – Time of the Essence.* In addition the Plaintiff advances no evidence to support this waiver.

## *Conversion*

The Defendants are entitle to a judgment in their favor for the Plaintiff's claim of conversion. To establish conversion, a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property. The plaintiff must establish that the defendant converted specific personal property to the defendant's own use and beneficial enjoyment. *Ellis v. Alcuri, 710 So.2d 1266, 1267 (Ala.Civ.App.1997)*, citing *Huntsville Golf Dev., Inc. v. Ratcliff, Inc., 646 So.2d 1334, 1336 (Ala.1994)*, *Anderson v. Smith's Towing Co., Inc., 867 So.2d 1121, (Ala.Civ.App.,2002).*

The Plaintiffs have failed to produce any evidence of a wrongful taking or an illegal assumption of ownership. The Plaintiffs have failed to advance any evidence of illegal use or misuse of the restaurant or detention of the property over the Defendant's objection.

### Unjust Enrichment

Summary judgment in favor of the Defendant is due to be granted for the Plaintiff's claim for unjust enrichment. A party cannot recover on a claim of unjust enrichment where there is an enforceable express contract between the parties concerning the same subject matter on which the unjust-enrichment claim rests. See *Kennedy v. Polar-BEK & Baker Wildwood Partnership, 682 So.2d 443, (Ala.1996)*. See also *Barry Mogul & Assocs., Inc. v. Terrestris Dev. Co., 267 Ill.App.3d 742, 643 N.E.2d 245, 205 Ill. Dec. 294, (1994)*, stating:

> "It is well established, as a general rule, that a plaintiff cannot pursue a quasi-contractual claim where there is an enforceable express contract between the parties.... 'Difficulties arise with quasi-contractual claims when there is an express contract between the parties. The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract.' *Sullivan v. Mazak Corp., 805 So.2d 674, (Ala.,2000)*.

### Fraud

Summary judgment is due to be granted as to the Plaintiff's fraud count. The Plaintiff argues in its response to the Defendant's summary judgment brief that state of mind is not capable of discerning from pleading filed with the Court. As to this matter, the Plaintiff is correct, however, the point of the Defendant's motion is the Plaintiff's failure to designate a time and place where any materially misleading statements or even if there were any materially misleading statements. During Mr. Goodwyn's deposition he

stated that there were no false or misleading statements made to him by either of the Defendants. (Goodwyn deposition page 80 - 82).

## CONCLUSION

For the foregoing reasons the Defendants are entitled to a grant of summary judgment in their favor. The Defendants would show unto the Court that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. In support of this Motion, the Defendant submits this reply brief, it's previous Motion for Summary Judgment and supporting exhibits, all being adopted and incorporated herein by reference. The Defendant respectfully requests that this Honorable Court enter a judgment against the Plaintiff as to all counts in the Plaintiff's complaint.

**RESPECTFULLY SUBMITTED** this the 24th day of April, 2006.


**/s/ Daniel G. Hamm**
_____
DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANTS
560 SOUTH MCDONOUGH STREET
SUITE A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

# CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this Defendant's Reply to Plaintiff's Brief in Response to Summary Judgment by electronic transmission or by placing a copy in the United States Mail with sufficient postage for first class delivery to the attorneys named below or parties if not represented by counsel.

**DONE** this the 24th day of April, 2006.


**/s/ Daniel G. Hamm**

DANIEL G. HAMM (HAM043)
ATTORNEY FOR THE DEFENDANTS
560 SOUTH MCDONOUGH STREET
SUITE A
MONTGOMERY, ALABAMA 36104
TELEPHONE    334-269-0269
FAX          334-323-5666

Von Memory                    Coleman Yarborough
James Day                     Attorney at Law
Memory, Day and Azar          2860 Zelda Road
469 S. McDonough Street       Montgomery, Alabama 36106
Montgomery, Alabama 36104